Ex parte BLAZEKOVIC.

(District Court, E. D. Michigan, S. D. February 20, 1918.)

No. 6054.

1. ARMY AND NAVY ⬅➡20—CONSCRIPTION ACT—EXEMPTIONS.

As Conscription Act May 18, 1917, c. 15, 40 Stat. 76, which in section 5 declares that all male persons between the ages of 21 and 30 shall be subject to registration in accordance with regulations to be prescribed by the President, except officers and enlisted men of the regular army, etc., and that all persons so registered shall be and remain subject to draft, unless exempted or excused, provides in section 4 that local and district exemption boards to be created by the President shall have power within their respective jurisdictions to hear and determine all questions of exemption, such boards have jurisdiction over nondeclarant aliens, and as such aliens are required to register, they are not, though the act provides for their exemption automatically, excluded from its provisions, but must present their claims to the proper boards in compliance with the rules provided.

2. CONSTITUTIONAL LAW ⬅➡318—DUE PROCESS OF LAW.

A nondeclarant alien, although by the terms of Conscription Act May 18, 1917, exempt from service, is not denied due process of law because required to present and secure his exemption through the exemption boards provided for; the requirement as to due process of law not entitling him to a judicial trial as to the question of exemption.

3. TREATIES ⬅➡5—SUSPENSION—CONGRESS.

As Conscription Act May 18, 1917, § 14, declares that all laws in conflict with the act are suspended during the emergency of existing war, a treaty entered into before the enactment of the statute, exempting an alien from military service, does not, unless he was duly exempted by the act, entitle him to such exemption, for the treaty, if in conflict with the act, was repealed; Congress having the same right to suspend or abrogate a treaty as any other law.

4. TREATIES ⬅➡11—NONDECLARANT ALIENS—TREATY RIGHTS.

That Conscription Act May 18, 1917, which provides for the exemption of nondeclarant aliens, requires them to present their claims for exemption to the exemption boards created by the President pursuant to the act, does not deprive such aliens of treaty rights securing them against liability for military service; it not being an infringement of the treaty exemption to prescribe the conditions under which it should be claimed.

5. ARMY AND NAVY ⬅➡20—CONSCRIPTION ACT—EXEMPTION—PRESENTATIONS.

The filing of an exemption claim as required by Rules and Regulations, § 10, for the selective draft provided for by Conscription Act May 18, 1917, and the affidavit required by section 18, showing that the registrant was a nondeclarant alien, is a condition precedent to exemption on that ground, and, where the exemption is not claimed as provided, such alien is not entitled to be exempted from military service.

6. CONSTITUTIONAL LAW ⬅➡70(3)—SEPARATION OF POWERS—WISDOM OF LEGISLATION.

The courts have no concern with the expediency or policy of a statute.

7. ARMY AND NAVY ⬅➡20—CONSCRIPTION ACT—ENEMY ALIENS.

As Conscription Act May 18, 1917, § 14, suspends all inconsistent statutes, and, while exempting subjects of Germany, makes no provision as to others who might become alien enemies, a subject of Austria-Hungary, unless excused as a nondeclarant alien, is not entitled to exemption because, by reason of a subsequent declaration of war against Austria-Hungary, he had become an alien enemy.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**8. ARMY AND NAVY ☜20—CONSCRIPTION ACT—DECISION OF EXEMPTION BOARDS.**

Though the provisions of Conscription Act May 18, 1917, making the decision of the exemption boards final, is constitutional, the civil courts, while they cannot review such decisions, may, where the boards have acted in excess of their jurisdiction, or have denied a fair hearing, grant relief.

**9. HABEAS CORPUS ☜23—CONSCRIPTION ACT—DECISION OF LOCAL BOARDS.**

Rules and Regulations, § 14, for the selective draft provided for by Conscription Act May 18, 1917, declares that, as soon as practicable after the order in which persons are liable to be called for military service shall have been determined, a list of the names and residences of such persons in the order of their liability shall be posted in the offices of the respective local boards in a place accessible to the public view, that as promptly as practicable a complete copy of such list shall be made accessible to the press, and that, when any person is called by a local board, notice shall be mailed by the clerk, directed to the address on his registration card. Petitioner, a nondeclarant alien and a subject of Austria-Hungary, was certified into military service, not having presented his objection to the local or district boards. *Held*, in the absence of any showing, other than petitioner's assertion that he received no notice, that the local board had not performed its official duty, petitioner is not, as the provisions of the act making the determination of such exemption boards final, are constitutional, and there is a presumption of performance of official duty, entitled to habeas corpus to secure his release on the theory that he was denied a fair hearing by the exemption boards.

**10. HABEAS CORPUS ☜23—CONSCRIPTION ACT—CERTIFICATION INTO SERVICE —HABEAS CORPUS.**

A nondeclarant alien is not entitled to habeas corpus to obtain his release, having been certified into service under Conscription Act May 18, 1917, as he failed to claim his exemption on account of alienage, where it did not appear that in accordance with Rules and Regulations, §§ 28 and 50, that he had by proper affidavit, together with an excuse for failure to earlier present the same, made claim for exemption to either the district or local board after certification.

**11. HABEAS CORPUS ☜6—RELIEF—DISCRETION.**

Where petitioner, who was certified into the service under Conscription Act May 18, 1917, having failed to comply with the rules and regulations as to claim for exemption, was not absolutely entitled to relief on account of his alienage, the issuance of habeas corpus to secure release rests in the sound discretion of the trial court.

**12. HABEAS CORPUS ☜6—CONSCRIPTION ACT.**

Where petitioner, who was certified into service under Conscription Act May 18, 1917, after appealing to his commanding officer for relief on the ground that he was a nondeclarant alien, did not file a petition for habeas corpus until nearly two months thereafter, and he had not presented his claim for exemption in accordance with the rules and regulations governing the draft, it is not an abuse of discretion to deny his application, for such claim should be presented at the earliest possible moment, and an alien should not be allowed to receive maintenance, pay, and allowances for a considerable time and then assert his exemption.

**13. ARMY AND NAVY ☜20—CONSCRIPTION ACT—SCOPE OF.**

As the Conscription Act provides for the exemption of nondeclarant aliens, and as such aliens would prove unsatisfactory soldiers, if unwilling to serve, it is against the policy of the law for local draft boards to attempt to include such aliens in the army; it being for the benefit of the service that they be excluded.

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

14. HABEAS CORPUS ☞85(1)—WRIT—PETITION—ISSUANCE OF WRIT.

One petitioning for habeas corpus to secure release from military service, into which he was certified under Conscription Act May 18, 1917, must, in view of the authority of the independent executive tribunals and military officers to first determine claims of exemption, affirmatively show on the face of his petition that he is entitled to such writ, and on hearing will be able to make at least a prima facie case entitling him to the release, or the petition will be dismissed, and neither will the writ be granted, nor will a rule to show cause why it should not be granted be issued, as in ordinary cases.

Habeas Corpus. In the matter of the petition of Dragutin Blazekovic. Petition denied.

Joseph B. Beckenstein, of Detroit, Mich., for petitioner.
John E. Kinnane, of Bay City, Mich., U. S. Dist. Atty.

TUTTLE, District Judge. This is a petition for a writ of habeas corpus, alleging that petitioner has been illegally and without warrant of law drafted into the military service of the United States under the conscription statute.

The petition alleges that petitioner is an alien, 25 years of age and a citizen of Austria-Hungary, who has not declared his intention to become a citizen of the United States; that on June 5, 1917, he duly registered under the provisions of the act of Congress of May 18, 1917, known as the Conscription Act; that when he presented himself for registration he informed the registration clerk that he was an alien, and had not declared his intention to become a citizen of the United States, which fact said clerk duly noted on his registration card; that he was given a serial and order number by one of the local boards in the city of Detroit, where he resided and registered; that he received no call to appear for physical examination, and that he first knew that he had been drafted when he was arrested, on or about September 26, 1917; that thereupon he immediately advised the persons who arrested him that he was not aware that he had been called, that he was an alien who had not declared his intention to become a citizen of the United States, and that he desired to claim exemption on that ground; that while in jail he notified one of the members of said local board to the same effect; that he was certified for military service without having been given an opportunity to present a claim for exemption therefrom; that, after being in custody for about two weeks, he was, in the month of October, 1917, transported to Camp Custer, near Battle Creek, Mich., within the jurisdiction of this court, where he is now detained by the commanding officer of said camp; that he has never taken any oath of enlistment in the National Army, has never released any of his rights in the premises, but has persistently and at all times asserted his right of exemption, and contended that he had been illegally drafted; that on or about November 16, 1917, by counsel, he presented to the local board a petition, stating the facts hereinbefore set forth and requesting said board to reopen his case and to grant him exemption as an alien, which request was denied;

that on or about November 22, by counsel, he presented to the district board a petition stating said facts, and requesting said board to reopen his case and to grant him said exemption, the nature of the decision on which petition is not alleged; that on or about November 23d, by counsel, he petitioned said commanding officer, stating the said facts and requesting relief, which was refused; that said local board has no jurisdiction over his person, because an alien who has not declared his intention to become a citizen of the United States is not subject to military service, being expressly excluded from the operation of the draft by section 2 of the Conscription Act, and that his status is not subject to determination by the exemption boards; that he is also excused from liability to military service by the provisions of a treaty between the United States and Austria-Hungary, promulgated June 29, 1871, and in force at the time of his drafting, the United States then not being at war with Austria-Hungary, such treaty "containing a clause for the rights of Austro-Hungarians in the United States as existing by the most favored nation clause"; that at said time there existed between the United States and Switzerland a treaty, ratified November 6, 1854, article 2 of which provided that "the citizens of one of two countries residing or established in the other shall be free from personal military service," and that under the "most favored nation clause," referred to in the first treaty mentioned, he was not liable to such military service; that under the rules and regulations governing the draft petitioner has no means of reviewing the decisions of said boards, and his only resort is to this court, and his only remedy in the premises a writ of habeas corpus; that after he had been transported to said camp, and on December 11, 1917, war was declared by the United States against Austria-Hungary, and he thereupon immediately became an alien enemy, and is now being held in the military service of the United States "contrary to the law of the land and to the policy of the government of the United States"; that the proceedings of said local board were illegal and void; that he was fraudulently and illegally denied the opportunity of a fair hearing; that he was denied the right of due process of law guaranteed to him by the United States Constitution; that the decision of said board was illegal, and contrary to the evidence presented, and without any support of fact or evidence. Wherefore he prays for a writ of habeas corpus, directed to said commanding officer and to all officers in the military service of the United States, so that inquiry may be made into the legality of his detention. The petition is signed and verified by petitioner as required by the federal statute applicable.

As I view this petition and the issues which it raises, the following questions are presented for consideration:

(1) Are nondeclarant aliens subject to the jurisdiction of the boards established under the Conscription Act for the purpose of executing the provisions of such act and of enforcing the rights and liabilities created thereby?

(2) What effect, if any, on the jurisdiction of such boards, or on the rights of a nondeclarant alien, has a treaty between the United States and the nation of which such alien is a citizen, entered into before the enactment of the Conscription Act, and providing for the exemp-

tion of citizens of such nation from the military service of the United States?

(3) May a nondeclarant alien be drafted into the military service of the United States by reason of his failure to file any claim for exemption in the manner provided by the rules and regulations governing the draft as prescribed by the President?

(4) May a citizen of Austria-Hungary, who has been drafted into the military service of the United States before the declaration of war between the United States and Austria-Hungary, if properly so drafted, be retained in such service against his will after the declaration of such war?

(5) To what extent, if at all, may the federal courts interfere with the decisions or actions of the exemption boards established under the Conscription Act and of the proper military authorities with respect to the drafting of nondeclarant aliens?

(6) How far must one seeking relief in the federal courts from the decisions of such boards and officers show his previous exhaustion of the remedies afforded by the Conscription Act?

(7) To what extent, if any, must one seeking such relief show diligence on his part in instituting proceedings for the enforcement of the rights which he claims?

[1] 1. I cannot agree with the contention presented in this petition to the effect that exemption boards have no jurisdiction over nondeclarant aliens, and that the latter are excluded entirely from the operation of the Conscription Act. It is true that by section 2 of the act it is provided that this draft "shall be based upon liability to military service of all male citizens or male persons not alien enemies who have declared their intention to become citizens" between certain ages, and that nondeclarant aliens are entitled to be excused from military service under the act. It does not follow, however, that such aliens are so excused automatically merely by the fact that they are nondeclarant aliens. Section 5 of the act provides, among other things:

"That all male persons between the ages of 21 and 30, both inclusive, shall be subject to registration in accordance with regulations to be prescribed by the President; and upon proclamation by the President or other public notice given by him or by his direction stating the time and place of such registration it shall be the duty of all persons of the designated ages, except officers and enlisted men of the Regular Army, the Navy, and the National Guard and Naval Militia while in the service of the United States, to present themselves for and submit to registration under the provisions of this act; * * * and all persons so registered shall be and remain subject to draft into the forces hereby authorized, unless exempted or excused therefrom as in this act provided."

Section 4 of the act authorized the President to create certain boards, and conferred upon such boards when so created—

"power within their respective jurisdictions to hear and determine, subject to review as hereinafter provided, all questions of exemption under this act, and all questions of or claims for including or discharging individuals or classes of individuals from the selective draft, which shall be made under rules and regulations prescribed by the President."

I think it clear that jurisdiction was thus conferred upon these boards to pass on the claims for exemption, or discharge, or excusal,

or whatever term be used, filed by nondeclarant aliens, and that the latter are required to comply with the requirements of the rules and regulations governing the procedure of such boards for that purpose. This, it seems to me, is the clear intention of the language of section 5 of the act already quoted, to the effect that:.

"All persons so registered shall be and remain subject to draft into the forces hereby authorized, unless exempted or excused therefrom as in this act provided."

It is not denied that petitioner was required to register, or that he did so register. Clearly, therefore, he is thus expressly made "subject to draft" unless he be "exempted or excused therefrom as in this act provided." . The method provided by the act for enforcing and applying such exemption or excuse consists of the establishment of the boards, exercising the jurisdiction referred to in the language of section 4 of the act, just quoted. Unless, therefore, petitioner be exempted or excused by such boards, in the manner provided by law, he is subject to draft.

I do not overlook the argument that the words "as in this act provided" refer to the grounds for exemption or excuse provided by the act. It will, however, be noted that, while the act does confer certain rights to exemption or discharge or excuse from the draft, yet such act does not itself actually exempt or excuse any one, within the specified ages, except women and those already serving the United States as members of certain military organizations. All that the statute does in this connection is to provide the grounds for exemption or excuse and a means of putting into execution such grounds. The act confers upon certain classes of persons rights to exemption or excuse. These rights are to be asserted through the machinery created by the act for that purpose. This is the only method whereby such persons may be exempted or excused. It will be noted that the statute does not provide that registrants remain subject to draft unless "*exempt* therefrom as in this act provided," but unless "*exempted* or *excused*" therefrom "as in this act provided." The words "exempted" and "excused," here used, obviously are the past participles of the verbs "exempt" and "excuse," and necessarily imply that the subjects of these verbs have been thus acted upon by some other persons "as in this act provided"; that is, by the draft boards expressly authorized—

"to hear and determine * * * all questions of exemption under this act and all questions of or claims for including or discharging individuals or classes of individuals from the selective draft."

In other words, the language of section 5 just quoted first requires "all male persons" between the ages designated (except those already in military service), whether or not having a right to exemption or excuse, to register. The act then follows with the further provision that:

"All persons so registered shall be and remain subject to draft into the forces hereby authorized, unless exempted or excused therefrom as in this act provided."

The plain meaning of this is that these persons, when first registered, were subject to draft; that is, they were not at that time exempted

or excused therefrom as in this act provided, even though having a right to claim such exemption or excuse. This is clearly shown by the language to the effect that they shall "remain subject to draft * * * unless exempted or excused therefrom." The query then naturally arises how they are to be thus exempted or excused therefrom. This question is expressly answered by the next words in the same sentence, "as in this act provided." How is a person having a right to exemption or excuse actually exempted or excused "as in this act provided"? Obviously, through the method created by the act itself, namely, the exemption boards having the exclusive jurisdiction already referred to. This construction, it seems to me, gives effect, not only to the intention of Congress to establish certain grounds for exemption, but also to its plainly expressed intention to confer upon these boards jurisdiction to determine—

"all questions of exemption under this act and all questions of or claims for including or discharging individuals or classes of individuals from the selective draft."

Any other construction would render the provisions respecting these boards unnecessary and meaningless. If the words "as in this act provided" refer, not to the manner of exempting, but to the grounds for exemption themselves, then not only nondeclarant aliens, but all other classes of persons having rights of exemption, discharge, or excuse under the act are also automatically excluded from the operation of the draft and from the jurisdiction of the exemption boards. No method for determining questions of exemption or discharge is provided by the act, or by any other statute, except through these exemption boards, and any construction of the act which would produce such a result, or which would remove any class or classes of such persons from the jurisdiction of such boards, would render it exceedingly difficult to apply such rights of exemption or excuse, and tend to make the act unworkable and to defeat its purpose.

[2] Petitioner's contention that he has been deprived of his liberty without due process of law is manifestly without merit. The following language in the opinion of the Court of Appeals for the Second Circuit in the recent case of Angelus v. Sullivan, 246 Fed. 54, —— C. C. A. ——, where the same contention was made and overruled, is applicable:

"But it is said that the act is unconstitutional, in that it deprives the complainant of his liberty without due process of law, contrary to the Fifth Amendment of the Constitution, which declares that no person shall be deprived of life or property without due process of law. The Supreme Court has, however, held that a judicial trial does not prevail in every case. Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 280, 15 L. Ed. 372 (1855). And in U. S. v. Ju Toy, 198 U. S. 253, 263, 25 Sup. Ct. 644, 646, 49 L. Ed. 1040 (1905), the court, speaking through Mr. Justice Holmes respecting the Chinese Exclusion Act (Act Sept. 13, 1888, c. 1015, 25 Stat. 476 [Comp. St. 1916, §§ 4306, 4314]), under which the decision of the Department of Labor is final as to the exclusion, said: 'If, for the purpose of argument, we assume that the Fifth Amendment applies to him, and that to deny entrance to a citizen is to deprive him of liberty, we nevertheless are of the opinion that with regard to him due process of law does not require a judicial trial.' That the decision of the question whether a person of Chinese descent was born

in the United States, and therefore entitled to enter the country, or whether he was born in China and under the Exclusion Act not entitled to enter, may be intrusted to an executive officer whose decision is final, and that it is due process of law is established law. We see no reason why the same doctrine is not equally applicable to the case in hand. And we therefore hold that the complainant is not deprived of due process of law by being compelled to submit to the final decision of the local and district boards the question whether he is a subject of Austria-Hungary and whether he has not declared his intention to become a citizen of the United States.

"The President, in the exercise of the authority conferred on him, has prescribed the rules and regulations for the local and district boards, and they were announced by the Secretary of War on June 30, 1917. And section 41 of the rules and regulations so prescribed is as follows: 'In the case of a claim of appeal filed by or in respect of any person from the final decision of a local board within the jurisdiction of such district board, the district board shall, if the name of such person is on the list certified to such district board by a local board within its jurisdiction as a person called and not exempted or discharged, examine and consider the claim, affidavits, and record in respect of such person filed with such district board by the local board. The district board may receive additional evidence in support of or in opposition to any such claim, provided such additional evidence is filed in the form of affidavits within five days after the receipt by such district board of the notice of filing a claim of appeal by or in respect of such person. Within five days after the closing of proofs in any such case, the district board shall decide in favor of or against any such claim, and shall affirm, modify, or reverse the decision of the local board. The decision of the district board shall be final. The district board shall thereupon notify, on a form provided by the Provost Marshal General for that purpose, the person by whom or in respect of whom such claim of appeal was filed that the district board has affirmed, modified, or reversed, as the case may be, the decision of the local board. If the decision of the local board is affirmed, such person shall stand as called for military service to be finally accepted as hereinafter provided.' It thus appears that the complainant seeks to have the District Court set aside a decision on his exemption claim which the act and the rules and regulations of the President declare to be final.

"The complainant's right of exemption is based on the provisions of section 2 of the Conscription Act, which provides that 'such draft as herein provided shall be based upon liability to military service of all male citizens, or male persons not alien enemies who have declared their intention to become citizens, between the ages of twenty-one and thirty years, both inclusive, and shall take place and be maintained under such regulations as the President may prescribe not inconsistent with the terms of this act,' and on section 18 of the rules and regulations prescribed by the President, which enumerates the persons or classes of persons to be exempted by a local board. Among others it exempts any person who is a subject of Germany, whether such person has or has not declared his intention to become a citizen of the United States. It then exempts 'any person who is a resident alien; that is, a citizen or subject of any foreign state or nation other than Germany who shall not have declared his intention to become a citizen of the United States.' It also provides that 'the claim to be exempted must be made by such person, or by some other person in respect of him, on a form prepared by the Provost Marshal General, and furnished by the local boards for that purpose.' Such claims must be filed with the local board which notified such person that he is called for service on or before the seventh day after the mailing by the local board of the notice required to be given such person of his having been called for service. The statement on the registration card of any such person that exemption is claimed shall not be construed or considered as the presentation of a claim for exemption. If the complainant is, as he alleges, a subject of Austria-Hungary, and has never declared his intention to become a citizen of the United States, as he also alleges, it is perfectly clear that he is not subject to the draft. Whether his allegations in this respect are true must, however, be determined in the manner prescribed by the act."

In the words of Judge Mayer, of the United States District Court for the Southern District of New York, in the case of United States ex rel. Koopowitz v. Finley (D. C.) 245 Fed. 871, in considering the same question:

"It would, of course, have been easy for Congress to except nondeclarant aliens from the registration provision of section 5. For instance, it did not include, and therefore excluded, women. It did, however, include all male persons within the draft age. The obvious purpose of this provision of section 5 was to construct a roster throughout the entire nation, which, as it were, would constitute prima facie the list from which the draft was to be made up. Section 5 made all registered persons subject to draft, 'unless exempted or excused therefrom as in this act provided.' There seems to be good reason, as matter of language, for using both words—that is, 'exempted' and 'excused.' Certain persons were by the act made exempt. Thus, to illustrate: Under section 4 regularly or duly ordained ministers of religion are exempt. Under the same section, however, the President was authorized to exercise his discretion to exclude or discharge from the draft or to draft for partial military service only, certain other classes, such, for instance, as county and municipal officials. These latter classes were not entitled to exemption as matter of right, for Congress conferred upon the President the discretion of determining whether certain classes should be excluded, which is but another way of conferring upon the President the right to excuse these classes. By virtue of section 2 of the act above quoted, nondeclarant aliens are exempt, because not included. But section 2 provides that the draft 'shall take place and be maintained under such regulations as the President may prescribe not inconsistent with the terms of this act.' This, therefore, is a general declaration in the early part of the act that the draft is to take place under lawful presidential regulations and, later in the act, to wit, in section 4, Congress has provided for the general nature and character of the regulations. Certainly section 5 as to registration, so far as it included nondeclarant aliens, would have been a useless provision, if the act did not after that operate upon nondeclarant aliens, as well as upon all other classes made exempt by the statute. Whether a person is a nondeclarant alien or not is a question of fact, exactly the same as whether a person is a duly ordained minister of religion or a student for the ministry in a recognized theological or divinity school, and the clear purpose of the act was that the fact should be ascertained by the administrative boards which the President was authorized to create. Any other method would have made the act, in part at least, unworkable, and it is a familiar rule of construction of statutes that, whenever possible, effect shall be given to the provisions of a statute, and that that construction shall be placed upon it, if possible, which shall enable its general plan or scheme to be carried out.

"Further, it is quite plain that Congress had in mind that some of those exempted by the act might not claim exemption and might be willing to serve in accordance with the draft. It must be further assumed that it was impossible for the local and district boards, or any other governmental agencies, independently to ascertain whether or not a relator was a nondeclarant alien; for such an inquiry would involve a search of the records of the naturalization courts, federal and state, throughout the entire country, to ascertain a negative, to wit, whether a person had not declared his intention—an obviously impossible and absurd inquiry. The whole plan of the act is undoubtedly to require that those who claim exemption shall affirmatively present their claim to the appropriate body, so that that body can determine as a fact whether the person falls within the exempted classes. When, therefore, no such claim is presented, and the proceedings of the local and the district boards are regular in every respect, the court cannot go outside of the proceedings of the boards to determine independently something which the act required should be determined by these boards. It is, of course, not strange that some who would have been entitled to exemption have failed to claim exemption; but the remedy, if any, in such cases, does not lie with the courts."

I am clearly of the opinion that petitioner was not, by the fact that he was a nondeclarant alien, automatically excused from the operation of the Conscription Act. It follows that these exemption boards have jurisdiction to consider, and, acting within their jurisdiction and in accordance with due process of law, to determine, the claims for exemption by such aliens, which claims must be made in compliance with the rules and regulations referred to, if such aliens desire to avail themselves of the right to exemption conferred upon them by the act.

[3] 2. The mere fact that this alien was exempt from military service by a treaty entered into before the enactment of the present statute does not entitle him to exemption. This treaty stood upon the same basis as any other law, and could be abrogated or suspended by later legislation. The power to abrogate a treaty by statute rests with the Congress, and the responsibility for the wisdom and justice of such action rests where the power is vested. Cherokee Tobacco Cases, 11 Wall. 616, 20 L. Ed. 227; Head Money Cases, 112 U. S. 580, 5 Sup. Ct. 247, 28 L. Ed. 798; Thomas v. Gay, 169 U. S. 264, 18 Sup. Ct. 340, 42 L. Ed. 740; Sanchez v. United States, 216 U. S. 167, 30 Sup. Ct. 361, 54 L. Ed. 432. The rule applicable was thus stated by the Supreme Court in Head Money Cases, supra:

"A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties, which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress by its declaration that 'this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.' A treaty, then, is a law of the land, as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute. But even in this aspect of the case there is nothing in this law which makes it irrepealable or unchangeable. The Constitution gives it no superiority over an act of Congress in this respect, which may be repealed or modified by an act of a later date. Nor is there anything, in its essential character or in the branches of the government by which the treaty is made, which gives it this superior sanctity. A treaty is made by the President and the Senate. Statutes are made by the President, the Senate, and the House of Representatives. The addition of the latter body to the other two in making a law certainly does not render it less entitled to respect in the matter of its repeal or modification than a treaty made by the other two. If there be any difference in this regard, it would seem to be in favor of an act, in which all three of the bodies participate. And such is, in fact, the case in a declaration of war, which must be made by Congress, and which, when made, usually suspends or destroys existing treaties between the nations thus

at war. In short, we are of opinion that, so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as Congress may pass for its enforcement, modification, or repeal."

Paragraph 14 of the conscription statute provides that:

"All laws and parts of laws in conflict with the provisions of this act are hereby suspended during the period of this emergency."

If, therefore, I am correct in my opinion, just expressed, that nondeclarant aliens are subject to the jurisdiction of the exemption boards, it follows that any treaty in conflict with this conscription statute, thus construed, was thereby suspended, and cannot now be invoked by petitioner in his behalf. This conclusion makes it unnecessary to determine the effect of the declaration of war against Austria-Hungary upon the treaty mentioned or the question as to whether, if the declaration of war did set at naught this treaty, the petitioner, who was inducted into the army before the declaration of war, could now avail himself of the benefits of the treaty.

[4] Furthermore, it will be noted that the act does not deprive nondeclarant aliens of any rights conferred upon them by treaty. As has been already explained, it does not deprive such aliens of the right to claim and receive the exemption provided by the treaty. On the other hand, it expressly gives such alien the right to claim such exemption. It is true that the act provides a method for asserting and enforcing such claim, and it is also true that, unless such method be pursued, the exercise of such right may be lost. This, however, is true of many, if not all, rights conferred by law. In this country of law, rights must be asserted in the manner provided by law, and whenever one having a legal right fails to observe the laws governing the assertion and enforcement thereof he runs the risk of finding himself unable to so assert and enforce such right. This, however, is not a legal deprivation of any right to which he may be entitled, but only a hardship necessarily attending government by law. The establishment, then, by the Conscription Act of the method for obtaining the benefit of this right of exemption or excuse conferred upon nondeclarant aliens does not operate to deprive them of any right to which they were entitled under any treaty. Although Congress had the power, as I have already pointed out, to take away such right, it is my opinion that it has not done so. Viewed, therefore, from either angle, this contention is without merit and must be overruled.

[5] 3. Section 10 of the Rules and Regulations governing the draft, in force at the time of the drafting of petitioner, provided that nondeclarant aliens—

"shall be exempted by such local board upon a claim for exemption being made and filed by, or in respect of, any such person and substantiated in the opinion of the local board. * * * The claim to be exempted must be made by such person, or by some other person in respect of him, on a form prepared by the Provost Marshal General and furnished by the local boards for that purpose. Such claim must be filed with the local board which notified such person that he is called for service on or before the seventh day after the mailing by the local board of the notice required to be given such person of his having been called for service. The statement on the registration card of

any such person that exemption is claimed shall not be construed or considered as the presentation of a claim for exemption."

Section 18 of the Rules and Regulations provides, among other things, as follows:

"The following persons or classes of persons if called for service by a local board and not discharged as physically deficient, shall be exempted by such local board upon a claim for exemption being made and filed by or in respect of any such person and substantiated in the opinion of the local board: * * * Any person who is a resident alien: that is, a citizen or subject of any foreign state or nation other than Germany, who shall not have declared his intention to become a citizen of the United States. * * * Any person who belongs to any of the classes above enumerated in this section shall be exempted on the following conditions: * * * Any person who is a resident alien—that is, a citizen or subject of any foreign state or nation other than Germany—who shall not have declared his intention to become a citizen of the United States, upon presentation to such local board, at any time within ten days after the filing of the claim of exemption by or in respect of such person, of an affidavit signed by such person setting forth" certain information therein specified.

It is therefore plain that the filing of this affidavit is expressly declared to be one of the "conditions" upon which such alien shall be exempted, and it is clear that petitioner has not complied with the requirements of law governing his right to claim exemption from the draft, the mode of enforcing such right having been thus prescribed by law. As was said in the case of United States ex rel. Koopowitz v. Finley, supra:

"If relator as matter of law was called upon to file his claim for exemption, he was obligated to do so in the manner prescribed by the statute and the regulations. * * * Relator not having filed his claim for exemption within the prescribed period, there was nothing before the board to show that he was entitled to exemption, and as a result he was properly certified to the district board, which in turn properly disallowed the relator's appeal."

[6, 7] 4. No statutory provision nor rule of law is referred to in the petition, and I know of none, excusing or releasing petitioner from the draft because he is now a citizen of Austria-Hungary, and therefore an alien enemy. Assuming that, before the enactment of the Conscription Act, an alien enemy could not be enlisted in the military forces of the United States, under the statutes then in force, yet section 14 of said act, as has been already noted, suspends any such statutes inconsistent with its terms, and as all male persons between the ages of 21 and 30 at the time of the registration thereunder are thereby made subject to draft unless properly exempted or excused as in such act provided, and no provision is made therein for the exemption or excusal of any aliens except those who have not declared their intention to become citizens of the United States and subjects of Germany, it seems clear that all other aliens between said ages are subject to said draft. With the expediency or policy of such legislation the courts, of course, have no concern, and any arguments based on such expediency or policy must be addressed to the tribunals responsible therefor. It follows that petitioner is not entitled to the relief prayed on the ground that, as a citizen of Austria-Hungary, he is an alien enemy.

[8, 9] 5. It will be noted that there is a broad allegation that petitioner has been denied a fair opportunity to present his claim for exemption, yet no facts are alleged on which such an allegation can be based, and it does not appear from the petition that as a matter of fact petitioner was deprived of the right or opportunity to file his claim in accordance with the terms of the rules governing the making of such claims. Section 14 of said rules provides, among other things, as follows:

"As soon as practicable after the order in which the persons, whose registration cards are in the possession of the respective local boards, are liable to be called for military service shall have been determined, * * * a list of the names and residences of such persons in the order of their liability to be called for military service * * * shall be posted in the offices of the respective local boards in a place accessible to the public view. As promptly as practicable thereafter a complete copy of such list shall be made accessible in the office of the respective local boards to the press with a request for publication. * * * When any person is called by a local board, notice thereof shall be mailed by the clerk of such local board to each person so called, directed to the address on his registration card. Each such notice shall contain a direction to appear for physical examination as required by section 16 hereof at a time and place fixed and stated in such notice."

Assuming, as I must, and as is not denied by petitioner, that the proper officials performed the duties thus required of them, it does not appear that petitioner has been deprived of any rights to which he was entitled in connection with the making of a claim for exemption, or that he was prevented from discovering that he had been called for examination or from making such claim in the manner prescribed by law. It does not appear that petitioner made or attempted to make any inquiry to ascertain whether his name was posted or published as thus provided, nor is any reason assigned for the failure to make such inquiry. Neither is it alleged that the board did not mail to his correct address the notice in question, and he does not explain or show why he did not receive the notice so mailed. So far as appears from the petition, petitioner may have removed from the address given at the time he registered and failed to notify the board of the change of such address. This may have been the reason for his failure to receive such notice, or the notice may have failed to reach him through any one of numerous other causes not beyond his own control.

Under these circumstances, I do not think that this court can interfere with the decisions of the local and district boards to which are committed the duty of enforcing and applying the provisions of the conscription statutes and the rules and regulations pursuant thereto governing the filing and allowing of claims for exemption and discharge. The Conscription Act makes the decisions of these tribunals final and this portion of such act was considered and declared constitutional by this court in the case of United States v. Sugar (D. C.) 243 Fed. 423. It is true that on a proper showing of the denial of a fair hearing, or a clear or gross abuse of the discretion with which these boards are vested, this court has the power, and it would be its duty, to grant relief from the decisions of such boards. As was said by the Court of Appeals for the Second Circuit in the case of Angelus v. Sullivan, supra:

"The civil courts can afford relief from orders made by such boards in any case where it is shown that their proceedings have been without or in excess of their jurisdiction, or have been so manifestly unfair as to prevent a fair investigation, or that there has been a manifest abuse of the discretion with which they are invested under the act."

In view, however, of the plain provisions of the rules and regulations referred to, and the familiar rule that even ignorance of a law does not excuse the failure to comply therewith, this court cannot interfere with the rulings of the tribunals and officers vested with authority to execute this statute, acting within such authority. Yamataya v. Fisher, 189 U. S. 86, 23 Sup. Ct. 611, 47 L. Ed. 721; United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040; Zakonaite v. Wolf, 226 U. S. 272, 33 Sup. Ct. 31, 57 L. Ed. 218; United States v. Sugar, supra, and cases therein cited.

[10] 6. Nor does it appear that petitioner has exhausted the remedies afforded him by the Conscription Act. Section 28 of the rules and regulations governing the draft provides that a local board may allow a claim for exemption or discharge to be filed or affidavits in support thereof to be filed after the expiration of the designated time within which such claim or such affidavits may be filed, provided it is shown to the satisfaction of the local board having jurisdiction that the failure to file such claim or such affidavits within the designated time arose because of the necessary absence of the claimant, or because the illness of the claimant prevented the filing of such claim or of such affidavits, or for any other cause or reason which appears to the local board to afford a reasonable ground for allowing the claim or affidavit to be filed. Section 50 confers the same power upon district boards.

It thus appears that, when petitioner was arrested as alleged in his petition, he was not without a remedy under the rules and regulations governing the draft. Although the time prescribed for the filing of his claim for exemption had expired, yet he could have requested from the local and district boards permission to then file such claim. While he alleges that his counsel presented to the local board a petition for the reopening of his case and for this exemption, a copy of said petition is not set out, nor are its allegations recited, and there is nothing to indicate whether it was a formal written petition, or merely a verbal request by said attorney, made to an individual member of the board, and not brought before said board as a tribunal. In the original petition filed herein, no reference was made to any petition presented to the district board. In an amended petition, however, it is alleged that on or about November 22d, one day before the presentation by petitioner of his application to his commanding officer hereinbefore referred to, his counsel presented to said district board a petition for a reopening of his case and his exemption on the ground claimed.

What has just been said with reference to the petition alleged to have been presented to the local board applies equally to the one thus alleged to have been presented to the district board. It does not appear that such petition was a formal written one, presented to said board officially. It does not even appear what, if any, action was

taken on said petition by said district board. Furthermore, there is no allegation that an adequate, or in fact any, affidavit or showing was made in support of any of his said petitions, if said petitions were properly presented, nor does petitioner allege that he was deprived of an opportunity to make such a showing. It does not, then, appear that petitioner has exhausted the remedies afforded him by the Conscription Act and the rules and regulations pursuant thereto before resorting to this court. I cannot assume that, if proper application and showing had been made to the tribunals invested with primary jurisdiction in such a case, petitioner would not have received the full measure of relief to which he was entitled. On the contrary, I do assume that the proper military officers will soon relieve our country of the necessity of clothing and paying this alien enemy who is unwilling to serve us. Our commanding officers will, I am certain, prefer to have those who are in law and in fact alien enemies deprived of loaded guns. My experience with the military authorities at Camp Custer in previous cases assures me of their careful attention and just treatment of all misfortunes of this kind resulting from errors of draft boards. Under such circumstances, the writ of habeas corpus should not be granted. Ex parte Lancaster, 137 U. S. 393, 11 Sup. Ct. 117, 34 L. Ed. 713; Minnesota v. Brundage, 180 U. S. 499, 21 Sup. Ct. 455, 45 L. Ed. 639; Yamataya v. Fisher, 189 U. S. 86, 23 Sup. Ct. 611, 47 L. Ed. 721; United States v. Sing Tuck, 194 U. S. 161, 24 Sup. Ct. 621, 48 L. Ed. 917.

[11, 12] 7. One further consideration may be mentioned. It will be noted that on or about November 23, 1917, petitioner appealed for relief to his commanding officer and that such relief was refused. Yet it was not until January 17, 1918, that the original petition herein was signed and verified, and no reason for this delay is shown. During the meantime petitioner was receiving military training, food, lodging, and pay from the government. It would seem not only fair and reasonable, but also necessary for the public welfare, that there should be a limit to the time within which one who has been certified to the army should be allowed to obtain release therefrom on the ground that he was improperly drafted. For example, could it be seriously contended that, after one had been so certified, had been taken to the military training camp, had completed his period of military training, and was on the eve of his departure to the battle ground, or perhaps even about to go into action, he could then for the first time resort to the courts for the purpose of raising objections to the proceedings whereby he was inducted into the army and be granted release therefrom? It is obvious that there should be some limitation upon the right to thus seek such release. Every consideration of public interest demands that in such cases a petitioner should show that he has been diligent in seeking this sort of relief. Petitioner did not comply with the rules and regulations governing the draft, and requiring the filing of written claim for exemption within the prescribed period. His right to relief in this court under the circumstances is not absolute, but depends upon the exercise of a sound discretion. It would seem

that it would not be an abuse of discretion to refuse to grant relief after such an unexplained delay as that disclosed in the present case.

[13, 14] I do not desire to be understood as approving of the drafting of this alien into the military forces of the United States against his will, in the manner alleged in the petition. Conceding that the motives of these draft officials and of other boards, small in number, producing like results by similar methods, are patriotic, it is plain that the means employed and the end achieved do not promote the best interests of this country. If the purpose be to force an alien into the army, in order that an American citizen may be kept at home, it is unpatriotic. It would deprive the country of the services of an American soldier and give in lieu thereof an unwilling alien. If the motive be patriotism, it is of the misguided and short-sighted brand. Assuming that to thus take advantage of the opportunity, afforded by a technical form of law, to trap an unwilling alien into the military service of this country can be justified on moral or equitable grounds, what is thereby gained? The result of each such case is to inject into our brave American army one unfriendly alien, and, in the present case, an alien enemy. Men of the type and spirit of this petitioner would make a poor army to champion the cause of liberty for the nation whose representatives had accorded them such treatment in bringing them to the colors. The plain intent of the Conscription Act was to exempt nondeclarant aliens who were unwilling to perform military service. The rules promulgated by the President were the machinery provided for accomplishing that purpose. The object in view is clearly as much the good of the army as the protection of the alien. The effort and discretion of the draft boards ought to be exercised in such a way as to keep such men out of the army. The crisis which confronts our country and the necessity for a strong American army, which can be quickly trained, I believe justify these observations. More than 50 similar petitions by aliens have been filed in this court during the past few weeks. I cannot view such a situation with other than grave concern. Because the legal conclusions which I have reached may seem to imply an assent to actions resulting in such a situation, I have deemed it my duty to thus briefly express the views which I hold in this connection.

It will be noted that I have disposed of the questions presented without first granting the writ prayed or issuing an order to show cause why such writ should not be granted. I have pursued this course because I am keenly conscious of the duty of this court to avoid, so far as is possible, interference with the proceedings of the independent executive tribunals and military officers to whom have been intrusted, in the first instance, the decision of questions arising in the execution of the Conscription Act. I appreciate the danger, especially in such an emergency as now confronts us, of an unseemly conflict between the judicial and executive branches of the government, and I am anxious to avoid such conflict, so far as is possible, without neglecting or shirking what may seem to me the discharge of my full duty. I am therefore of the opinion that, before the writ should be issued in such a case, petitioner ought to affirmatively show, on the face

of his petition, that he is clearly entitled to such writ, and that on the hearing thereon he will be able to make at least a prima facie case entitling him to the release sought. He ought, before such writ or order to show cause is issued, by his allegations to resolve in his favor all doubts naturally arising in the mind of the court as to matters which upon the hearing might make it the duty of the court to remand him to the custody of the officers who had been compelled to produce him in court. The petitioner has not affirmatively, on the face of his petition, made out such a case as would warrant the court in subjecting the military authorities to the annoyance and embarrassment of transporting him from the military camp where he is detained and producing him before the court.

For the reasons stated, the petition will be denied.