**UNITED STATES v. RUMSA.**

**RUMSA v. HERSHEY et al.**

**Nos. 10894, 10666.**

United States Court of Appeals, Seventh Circuit.

May 13, 1954.

John O'C. Fitzgerald, Edward F. Vyzral, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., John Peter Lulinski, James B. Parsons, Assts. to U. S. Atty., Chicago, Ill., Irwin N. Cohen, U. S. Atty., Chicago, Ill., for appellee.

Before DUFFY, SWAIM and SCHNACKENBERG, Circuit Judges.

SWAIM, Circuit Judge.

This opinion disposes of two appeals by Antanas Juratis Rumsa, the first being an appeal in a criminal case and the second being an appeal from the order and judgment of the District Court dismissing Rumsa's amended complaint in an action to enjoin the defendants from inducting and causing him to be inducted and for a declaratory judgment.

### No. 10894—The Criminal Case.

We shall first consider the appeal of Rumsa from the judgment of the District Court entered on a verdict of guilty on an indictment which charged him with refusing to submit to induction into the armed forces of the United States in violation of Section 462, Title 50 Appendix, United States Code Annotated, and the prescribed rules and regulations thereunder.

The defendant was born in Lithuania on October 9, 1929, and resided there until sometime in 1944 when the Russians invaded that country and the defendant was forced to flee to Western Germany. In Germany he was placed in a labor camp and kept there until he was finally liberated by the American forces. On February 27, 1950, the defendant executed a printed form of Application for Immigration Visa and Alien Registration. This form stated that the defendant's purpose in going to the United States was "to reside" and that he intended "to remain permanently." This form also indicated that the defendant had had five years in elementary school and eight years in secondary school and that he was able to speak, read and write Lithuanian and a little English and German. The American Vice Consul approved this application and granted the immigration visa to the defendant as a displaced person pursuant to Public Law 774, 50 U.S.C.A.Appendix, § 1951 et seq. Pursuant to the authority granted by the United States on this application, the defendant was admitted to, and did, enter the United States on April 6, 1950, coming to Chicago, Illinois, to live. On August 12, 1950, he registered under the Selective Service Act with Local Board No. 65, located at 63rd Street and Western Avenue in Chicago. A little more than a month later, September 15, 1950, the defendant filled out a Selective Service Questionnaire and on October 9, 1950, he was classified I–A (ready for service). On January 11, 1951, the defendant was ordered by the local board to report for physical examination on January 29, 1951.

On January 23, 1951, the defendant wrote a letter to the local board protesting his being required to report for a physical examination and asking for reconsideration of his case. He assigned as reasons therefor that: "Reporting for service would mean to leave my aged parents without effective help alone. It also would mean calling off my advanced studies at the University of Illinois, department of Mechanical Engineering. I am non-resident transfer student. I am there in my third semester. My health is not well." The defendant then asked that the board regard this letter as his application for "deferment from service" and that the board advise him as to "what shall be done regarding the physical examination."

The following day the local board, by letter, informed the defendant that he should report for this physical examination without fail. But instead of reporting as ordered, the defendant again, by letter, protested his being required to report and assigned as his reasons therefor that: (1) "Persons owing allegiance to some other countries cannot under international laws be drafted to other country's armed forces without the mutual agreement between the respective countries." (2) "Present Selective Service and U. S. Armed Forces practice is dis-

criminating against aliens in ordering non-citizens of U. S. into service on equal basis with American subjects but not providing for equal opportunities. They are: noncitizens are being drafted but are not being admitted as volunteers to U. S. Navy, U. S. Marine Corps, U. S. Army Reserve units, U. S. Officers training schools, ROTC units, etc., etc. (As a noncitizen I have been refused acceptance to U. S. Army Intelligence unit.)" (3) "Daily life of a foreign subject in U. S. discriminates against him, hence he does not enjoy the right to equal opportunity to seek for certain jobs, schools paying equal tuition as residents." Defendant, therefore, demanded that the local board either reconsider its prior order or provide him with the rights of which he claimed he was being deprived.

On January 29, the defendant, having failed to report for examination, was ordered to report to the induction center on February 15, 1951, for examination and induction as a delinquent. He reported, was given a physical examination, was determined to be fit for military service and was so informed by the local board. But he refused to submit to induction, stating "that he had served in the Army of other nations and would serve in the Army of the United States if hostilities began, but as the situation is at present time he would not enter the Armed Forces." It was then explained to the defendant that his refusal would constitute a felony and would subject him to severe punishment. On March 5, 1951, the defendant executed a Form 130, claiming relief from military service as an alien. This form provided that any alien claiming such relief from military service "shall thereafter be debarred from becoming a citizen of the United States." Upon receipt of this form from the defendant the local board classified him as IV–C "until indefinitely." But, on January 24, 1952, on the advice of the State Director of Selective Service that Rumsa was not entitled to a IV–C classification on Form 130, defendant's classification was reconsidered and was changed to I–A. The board, on March 14, 1952, or-

dered Rumsa to report for another examination on April 25. At this examination the defendant was again found to be acceptable for military service, his classification as I–A was not changed and he was so notified. He again, on May 3, 1952, executed and filed a Form 130 with the local board claiming exemption as an alien. One printed sentence of this form stated that he had not "been admitted to the United States for permanent residence." This was the first time this idea had been mentioned to the local board.

Long after the ten day period for taking appeals from the local board had passed the defendant attempted to have the local board reopen the matter of his classification. This the board refused to do. Thereafter, the defendant was ordered to report for induction on July 22, 1952, and again on August 21, 1952. It was on his refusal to submit to induction on August 21 that the defendant was indicted.

The defendant seems to contend that, since he is an alien, he cannot be required to submit to induction into the armed forces of the United States; that requiring him to be inducted violates international law and also violates the Fifth Amendment to our Constitution; that, further, as a temporary resident alien, he had the right to be deferred from military service by waiving the right ever to become an American citizen; that by his executing and filing Form 130, he did waive his right to ever become an American citizen; and that he thereby acquired the right to be permanently classified as IV–C, a right to exemption which could not thereafter be taken away from him even by a change in the law by Congress.

It is true that the Selective Training and Service Act which was in effect when Rumsa came to this country and when he first registered did provide that any citizen or subject of a neutral country should be relieved from liability for training and service if, prior to his induction, he had made application (Form 130) to be relieved of such liability. But in 1951 the Congress, alarmed by the interna-

tional situation, determined that the safety of this nation required that more men be inducted for training and service. See legislative history of Universal Military Training Act in U. S. Code Congressional and Administrative Service for 1951, Volume 2, pages 1472–1521. On page 1512 of this history, in the Conference Report, we find the recommendation that the law should be so changed that "All aliens admitted for permanent residence in the United States shall be immediately liable for induction into the Armed Forces or the National Security Training Corps under the same conditions applicable to citizens. * * * "

■ There can be no question but that the Universal Military Training and Service Act as amended authorized the selection and induction of aliens who had been admitted to the United States for permanent residence. Section 454(a) of 50 U.S.C.A.Appendix, § 4(a) of the Universal Military Training and Service Act, as amended June 19, 1951, expressly provided: "Except as otherwise provided in this title * * * every male alien *admitted for permanent residence* * * shall be liable for training and service in the Armed Forces of the United States * * *." And Section 456 of 50 U.S.C.A.Appendix, which gave to the President broad powers to exempt various classes of aliens, expressly provided: "* * * except that *aliens admitted for permanent residence* in the United States shall not be so exempted." (Our emphasis.) This Act also provided, 50 U.S.C.A.Appendix, § 467(a): "Except as provided in this title all laws or any parts of laws in conflict with the provisions of this title are repealed." Such clear language leaves no ambiguity for interpretation. We may only apply such a law as it is written.

■ If the United Sates had made a prior treaty with Lithuania or an agreement with other nations providing that Lithuanian subjects or other aliens should not be inducted into our armed forces, such a treaty or agreement would be in conflict with the provisions of the Universal Military Training and Service Act as amended, and this later Act of Congress would prevail. Where such a treaty or agreement is in conflict with a later conscription statute enacted by Congress the treaty or agreement is thereby suspended insofar as it conflicts, and, therefore, cannot be invoked as a defense to a violation of the conscription law. Ex parte Blazekovic, D.C., 248 F. 327, 337; Ex parte Larrucea, D.C., 249 F. 981, 983. In American Jurisprudence we find the general principle and the exception thereto stated as follows:

"It is a general principle that an alien is exempt from military duty in the country in which he is residing. Nevertheless an alien is not necessarily exempt from military service by virtue of a treaty entered into before enactment of a Conscription Act, since a treaty, like any other law of the United States, may constitutionally be repealed or suspended by Congress. Whether or not an alien resident within the United States is subject to military service depends ultimately, therefore, upon the terms of the draft law." 2 Am.Jur., p. 475, Sec. 26.

The defendant's contention that he was deprived of his constitutional right to due process by being required to submit to induction in our armed forces is answered against him in United States v. Lamothe, 2 Cir., 152 F.2d 340, 342, and in the decisions of many other federal courts.

The defendant stresses the fact that he was admitted to the United States as a "displaced person," and contends that the Constitution of the International Refugee Organization contemplated that such persons were to be admitted by other nations only with the idea that such displaced persons were to be returned to the country of which they were nationals at the earliest practicable time. But this constitution also expressly provided that where such repatriation did not take place the member nations of the organization might facilitate "*the emigration to, resettlement and re-estab-*

*lishment in other countries of such individuals or family units."* (Our emphasis.) This language clearly shows that in cases such as Lithuania, where the nationals of the country who had been displaced could not safely be returned to their native land, they might be admitted to other countries for permanent residence.

It is significant that Congress, in the Joint Resolution authorizing the President to accept membership by the United States in the International Refugee Organization, expressly conditioned such authorization on the reservation that such acceptance should not constitute or authorize action "(1) whereby any person shall be admitted to or settled or resettled in the United States * * * without prior approval thereof by the Congress, and this joint resolution shall not be construed as such prior approval," or "(2) which will have the effect of abrogating, suspending, modifying, adding to, or superseding any of the immigration laws or any other laws of the United States." 22 U.S.C.A. § 289. This Joint Resolution so authorizing the acceptance of membership by the United States was approved July 1, 1947. The next year, 1948, Congress enacted Public Law 774, 50 U.S.C.A.Appendix, § 1951 et seq., under the terms of which the defendant and others were admitted to the United States as displaced persons. In this later Act Congress carefully defined the displaced persons who were eligible for admission into the United States. In Section 1951(c) a displaced person to be eligible for admission to the United States under that paragraph, in addition to other qualifications, was required to be one "who has not been firmly resettled", and "who is qualified under the immigration laws of the United States for admission into the United States for permanent residence". Paragraph (d) of the same Section 1951 provides that a displaced person to be eligible for admission to the United States under that paragraph must, among other requirements, be (1) one who could not return to the country from which he was displaced be-

cause of fear of persecution on account of race, religion or political opinions; (2) "whose admission into the United States for permanent residence is recommended by or on behalf of the Secretary of State and the Secretary of Defense"; and (3) "who is qualified under the immigration laws of the United States for admission into the United States for permanent residence".

■ A study of the Constitution of the International Refugee Organization, of the Joint Resolution authorizing acceptance by the United States of membership therein, and of the Act authorizing the admission into the United States of displaced persons convinces us that the contention of counsel for the defendant that the local board and the District Court were required to find that the defendant was not admitted to the United States for permanent residence is unsound. We are more inclined to the belief that the language of the Act under which Rumsa was admitted tends to support a finding that he was admitted for permanent residence.

■ The defendant also contends that the trial court committed error in instructing the jury that:

"The decision of the local board made in conformity with regulations is final, and the determination as to whether the board's decision was in conformity with the regulations is made exclusively by the trial judge. Since the trial judge has decided that the local board's determination was made in conformity with the regulations, the only question left for the jury is whether the defendant wilfully and knowingly failed, neglected or refused to submit to induction as ordered by the local board."

The defendant contends that the court should have submitted to the jury the question of the validity of the board's order. We think that the decisions of the Supreme Court of the United States are clearly against this contention. In Estep v. United States, 327 U.S. 114, at

page 122, 66 S.Ct. 423, at page 427, 90 L.Ed. 567, the Supreme Court said:

"The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant. (Citing authority.)"

And in Cox v. United States, 332 U.S. 442, 453, 68 S.Ct. 115, 120, 92 L.Ed. 59, the Supreme Court said:

"When the judge determines that there was a basis in fact to support classification, the issue need not and *should not be submitted to the jury.* Perhaps a court or jury would reach a different result from the evidence but as the determination of classification is for selective service, its order is reviewable 'only if there is no basis in fact for the classification.' * * * Consequently when a court finds a basis in the file for the board's action that action is conclusive. The question of the preponderance of evidence is not for trial anew. It is not relevant to the issue of the guilt of the accused for disobedience of orders. Upon the judge's determination that the file supports the board, nothing in the file is pertinent to any issue proper for jury consideration." (Our emphasis.)

The defendant here seems also to be under the impression that, under the facts of this case, classification of IV–C gave him a permanent status of not being subject to military service and prevented subsequent changes in the law by Congress and regulations promulgated in conformity with such changes from applying to him. This, of course, cannot be supported.

■ It necessarily remained within the province and was the duty of Congress to be constantly alert to impending danger, to appraise such danger, and to raise and support armies of a sufficient number of men to be able to meet the danger successfully. Signs of increasing danger in 1951 were apparent to all. This naturally called for increased numbers in the armed services. The increased numbers could be secured only by enlarging the field from which to draw. This was accomplished by certain amendments which, among other things, reduced the age at which men were eligible, reduced the physical and mental standards required for induction *and made all aliens admitted for permanent residence in the United States immediately available for induction.* No classification of any individual could be considered permanent as against changes in the law, changes in the circumstances of the individual on which the classification was made or changes in valid regulations promulgated under the changed law. To hold that a classification, once made, was binding on the Government regardless of changing conditions and amended laws to meet such changing conditions might, in effect, destroy the power of Congress to raise and support armies.

The defendant had come to the United States from Germany in 1950 with his father and mother. On August 12, 1950, he registered for Selective Service, giving the family address in Chicago as his residence. At that time he had already secured work with the National Video Corporation, and a short time later he enrolled in the Chicago Navy Pier Branch of the University of Illinois. He was a national of Lithuania and, since the Russians had taken over that country and had set up a puppet government, it was uncertain when, if ever, he might be able to return to his native land.

The record before us contains three letters written by the defendant to the

local board which shed light on the question. The first letter, written January 23, 1951, and set out above, protested his being required to report for a physical examination and asked for reconsideration of his case. However, the "aged parents" to whom he referred in this letter are shown by the record to have then been 53 and 49 years of age. The record shows that the defendant was not, as he claimed in this letter, a "transfer" student, and that instead of his health being "not well," as he also claimed, he was then physically fit for military service. There was no intimation in this letter that he had not been admitted to this country for permanent residence.

Defendant's second letter, written to the board a week later and also set out above, questioned the right of this country to draft any alien without the consent of the country of which the alien was a national, and also complained of discrimination in the Selective Service organization in not permitting an alien to choose the branch of service he desired. Again in this letter we find no mention of any question as to his having been admitted to the United States as a permanent resident.

In his third letter to the board, dated August 19, 1952, obviously written by his attorney and purporting to be an appeal from the action of the board in ordering him to report for induction on August 21, 1952, defendant for the first time mentions the statement in his application for an immigration visa that he intended to come to the United States for permanent residence. In this belated raising of the question the defendant does not claim that he did not understand the meaning of the statements that his purpose in going to the United States was "to reside" and that he intended "to remain permanently." Instead defendant finally claims, three days before the last date fixed for his induction, that the "recitations in my Application for Visa as to permanent residence are not conclusive, for that they were obtained and made under conditions which made it impossible for me to voluntarily make

said statement." To support this contention the defendant cites Schioler v. United States, D.C., 75 F.Supp. 353. In that case an American man and his wife were in Denmark with their two children when World War II broke out. They were in fear of danger to themselves and their children from the Germans. Upon the advice of Danish officials the husband and wife executed an application for Danish citizenship to avoid the danger. The court there held, 75 F.Supp. at page 355, that in so acting in such an emergency the signing of the application by the wife was not "such a voluntary renunciation or abandonment of her nationality as to forfeit her American-born citizenship." The situation there was a far cry from Rumsa's situation when he said under oath in his application for an immigration visa that he wanted to come to the United States to reside here permanently. When he made this application in Western Germany Rumsa was not in any present danger. Of course, conditions there were crowded and probably not too pleasant and he wanted to come to the United States, a country which, of course, offered many more opportunities and a more pleasant life than was then possible in Germany. But that would not justify his making a false oath as to his intention to remain here permanently, in order to induce the United States to admit him. If we grant that this statement of his was not "conclusive," it was very convincing as to his intention at the time it was made. The local board certainly was not bound to and apparently did not believe Rumsa's statement in this third letter that he then, when faced with immediate induction, claimed to be merely a "sojourner" and not a "resident."

In the trial court and on this appeal the defendant is apparently urging that, since he was not entirely familiar with the English language at the time he made application for his Immigration Visa and Alien Registration as a displaced person, he did not understand that his application stated that his purpose in coming to the United States was to reside here per-

manently. However, we find nothing in the records which were before the local board when the defendant was last classified which even suggested this question. But if the defendant had raised this issue before the local board, his present assertions go only to the matter of whether or not he knowingly and understandingly intended to say that he wished to come to the United States for permanent residence. He does not claim that any fraud was perpetrated on him to induce him to make this statement. The statement was included in the application and he was permitted to come to the United States on the basis of that application, including the statement of his intention.

■ The conscription law which the defendant violated by refusing to submit to induction does not say that aliens who have come here intending to stay permanently shall be subject to military service; instead it says that those who are qualified for and who are *admitted* for permanent residence are to be inducted. The emphasis is therefore on the intention of the officials who approve the Application for Immigration Visa and those who consent to the alien's admission into the United States, not necessarily on the intention of the alien. With an application for a visa such as we have here before the officials whose duty it was to decide as to his admission, there cannot be much doubt but that Rumsa was *admitted* to the United States for permanent residence regardless of what his secret intention may actually have been.

■ When we consider this record as a whole, including the conflicting and patently untrue statements in the defendant's letters frantically urging that he be excused from military service, we have no hesitation in saying that there was a factual basis for the action of the local board in finding that he was admitted to the United States for permanent residence, and that he was, therefore, properly classified in January 1952 as I–A. Under the rule of the Cox and Estep decisions of the Supreme Court the District Court properly decided this and then left to the jury only the question of whether the defendant had "wilfully and knowingly failed, neglected or refused to submit to induction as ordered by his local board," a question which the jury decided against the defendant. The burden was on the defendant to establish facts before the local board which showed his right to exemption from military service. United States v. Schoebel, 7 Cir., 201 F.2d 31, 32; Davis v. United States, 8 Cir., 203 F.2d 853, 858. This the defendant failed to do.

Counsel for the defendant have earnestly argued to us that the conscription of aliens is extremely bad policy on the part of the United States; that prior to the enactment of the Universal Military Training and Service Act the United States and most other nations had consistently refused to draft aliens; that the new policy which Congress adopted in 1951, if followed, will in effect invite other nations to force our nationals who may be residing in those countries to submit to service in their armies; and that, therefore, none of our nationals residing abroad will be safe from conscription by those countries or from the many dangers which service in foreign armies entail.

■ Even if all this be true there is nothing the courts can do about it. The question of whether or not aliens should be conscripted is a question of policy—a political question which is for the executive and legislative branches of the Government to solve. Such questions are entirely outside the realm of the judicial branch. Coleman v. Miller, 307 U.S. 433, 455, 59 S.Ct. 972, 83 L.Ed. 1385; United States v. Lamothe, 2 Cir., 152 F.2d 340.

■ The grant of power to Congress to raise and support armies is certainly sufficient to authorize the adoption of the present policy to conscript aliens. It is, of course, also within the power of Congress to change the conscription law to again excuse aliens from service in our armed forces at any time Congress determines that the services of aliens are either unnecessary or should not as a matter of policy be required.

And as to this defendant and other aliens who have been convicted of violations of the present draft law, a pardon is always within the power of the President. Neither of these courses is open to the judiciary.

Finding no error, the judgment of the District Court is

Affirmed.

### No. 10666—The Civil Case.

As indicated above, Number 10666 is an appeal from an order of the District Court dismissing the amended complaint in a civil action filed by Rumsa to enjoin his induction and for declaratory relief.

As we have stated, Rumsa was reclassified I–A on January 24, 1952. There was no appeal taken from this classification. He reported for a physical examination on April 25, was found to be physically qualified for military service and was so notified. On June 5, 1952, prior to the receipt of notice to report for induction, he filed this action in the District Court.

The prayer for relief requested, in pertinent part, the following: That the court enter a judgment declaring that the plaintiff is in a status other than that of a permanent resident, that he is not subject to the selective service laws and regulations or in the alternative that he is entitled to be placed in Class IV–C and that reclassifying him as I–A was a violation of due process; and that the defendants be enjoined from ordering his induction and from inducting him into military service.

The complaint was dismissed by the District Court on July 3, 1952, and the plaintiff docketed this appeal in this court on July 30. In his complaint below and in his appeal in this court, the plaintiff has made the same contentions and advanced the same arguments as those on which he relied in the criminal case, both here and in the court below. We have affirmed the judgment in the criminal case after carefully considering and discussing at length his various theories. It is obvious, therefore, that the issues upon which the prayer for relief was predicated have already been decided adversely to the plaintiff both in the District Court and in this court.

However, we think it is well to point out that the complaint in this case was properly dismissed by the District Court for reasons other than those we have considered on the merits. The plaintiff not only failed, after having been reclassified I–A, to take advantage of the machinery for appeal within the Selective Service System, but he filed this action when he was not even under an order to report for induction. It is clear, however, that a registrant may challenge his classification in court only if he has first exhausted all available opportunities for administrative relief. This means that a timely appeal of his classification must be made to the review authorities within the Selective Service System. Olinger v. Partridge, 9 Cir., 196 F.2d 986. It means also that he must obey an order to report for induction, for at that stage of the process he may yet be found unacceptable for military service. Williams v. United States, 9 Cir., 203 F.2d 85.

Thus, in Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305, a registrant who had appealed his classification but who thereafter refused to obey an order to report for service could not challenge his classification in a criminal prosecution for such failure to report. "Completion of the functions of the local boards and appellate agencies, important as are these functions, is not the end of the selective service process. The selectee may still be rejected at the induction center * * *." Falbo v. United States, 320 U.S. 553, 64 S.Ct. 348. Later, in Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, the registrants involved had duly appealed their classifications and had reported for induction, but after being accepted by the military they had refused to submit to induction. The Supreme Court recalled that in Falbo it had "found no provision for judicial review of a registrant's classification prior to the time when he had taken all the steps

in the selective process and had been finally accepted by the armed service", Estep v. United States, 327 U.S. 115, 116, 66 S.Ct. 424, but it held that under the different circumstances in Estep the classifications could be challenged in the resulting criminal prosecution. "Here these registrants had pursued their administrative remedies to the end. All had been done which could be done." Estep v. United States, 327 U.S. 123, 66 S.Ct. 428.

 It seems almost too obvious for discussion that in this case the plaintiff has completely failed to take the prerequisite administrative steps to entitle him to judicial review of his classification. The fact that he requested, in part, a declaration of his alien status does not alter the legal principles to be applied. The question of his status was before the local board and was, of course, relevant to the board's determination of what it considered to be the proper classification. The filing of his complaint was an attempt by the plaintiff directly to attack this determination and to interfere with the orderly processes of the Selective Service System. He had neither appealed his classification to the authorities provided under the Act, nor had he reported for induction. In fact, he was not even faced with an order to report, much less had he encountered the threat of imminent induction. His complaint, filed prior to the exhaustion of all administrative remedies, therefore, constituted the "litigious interruption of the process of selection" which the Supreme Court denounced in Falbo, 320 U. S. at page 554, 64 S.Ct. at page 349.

 It makes no difference, of course, that here the plaintiff attempted to challenge his classification in a civil action for declaratory and injunctive relief. A contrary view would be in direct conflict with the principle enunciated in Falbo and later refined in Estep. The basic fact remains that judicial review is not available until the selective process is at an end, and this must necessarily be so irrespective of the nature of the proceeding in which such review is sought. Thus, there was no controversy of which the District Court in this case could have taken cognizance. See Permutt v. Armstrong, D.C., 112 F.Supp. 247; Bridges v. Thomas, D.C., 62 F. Supp. 828; Meredith v. Carter, D.C., 49 F.Supp. 899; Stone v. Christensen, D.C., 36 F.Supp. 739.

The order of the District Court in this civil case is also

Affirmed.