### Ex parte LARRUCEA et al.

(District Court, S. D. California, S. D.   October 6, 1917.)

#### No. 1304.

1. TREATIES ⬅️11—OPERATION AS TO INCONSISTENT LAWS.

It is the rule of decision in the United States that, in so far as the judicial department is concerned, a treaty occupies no position of superiority over an act of Congress, and that, when inconsistent or irreconcilable, the latest in point of time must control.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. TREATIES ⬅➡11—SELECTIVE SERVICE LAW—EXEMPTION—CONFLICT WITH
   TREATY.
   Under the provisions of Selective Service Law, May 18, 1917, c. 15, 40
   Stat. 76, that the draft "shall be based upon liability to military service
   of all male citizens, or male persons not alien enemies, who have de-
   clared their intention to become citizens, between the ages of 21 and 30
   years, both inclusive," and that all persons registered thereunder "shall
   be and remain subject to draft,  *  *  *  unless exempt or excused there-
   from as in this act provided," a resident subject of Spain, within the
   registration age, who has declared his intention to become a citizen, is
   subject to the act, unless exempted as provided therein, and cannot be
   exempted by the courts, notwithstanding the provisions of the treaty
   between Spain and the United States of April 20, 1903 (33 Stat. 2108),
   that such subject shall in the United States be exempt from all compul-
   sory military service.

Application of Victor Larrucea and three others for writs of habeas
corpus. Writs denied.

A. V. Dalrymple, of San Francisco, Cal., and Gale & Cobb, of Los
Angeles, Cal., for petitioners.

Clyde R. Moody, Asst. U. S. Atty., of Los Angeles, Cal.

BLEDSOE, District Judge. Pursuant to petitions filed, an order
to show cause why writs of habeas corpus should not issue was en-
tered. Upon the hearing it developed that the above-named petition-
er, with three of his countrymen, are citizens of the kingdom of Spain;
for some years they have been domiciled within the United States, and
each of them has heretofore filed his declaration of intention to become
a citizen of the United States under the naturalization laws thereof;
they were arrested off the shore of Mexico by a United States war
vessel, and are now detained under appropriate process by the marshal
of the district as for evading the Conscription Act hereinafter refer-
red to.

Petitioners claim that when taken into custody they were proceed-
ing on their way to Spain. There is no issue as to the facts, and the
single question presented is whether or not the petitioners are subject
to the provisions of the Conscription Law. Their claim in that behalf
is that, owing to a treaty between Spain and the United States, they
are exempt from all forms of compulsory military service in the Unit-
ed States, and under the undoubted law of nations had the right, in
spite of the Conscription Law, to leave the United States and return
to the land of their nativity. Moore, International Law Digest, vol.
4, page 52.

The existing treaty between Spain and the United States, proclaimed
April 20, 1903, provides in article 5 (33 Stat. 2108):

"The citizens or subjects of each of the high contracting parties shall be
exempt in the territories of the other from all compulsory military service
by land or sea, and from all pecuniary contributions in lieu of such, as well
as from all obligatory official functions whatsoever." Malloy's Treaties and
Conventions, vol. 2, page 1701.

The claims of petitioners are resisted by the government of the
United States on the ground that the Conscription Law provides in

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

express terms for their subjection to compulsory military service, and that, being later in date than the treaty with Spain, it controls, and that, in consequence, they should be remanded for trial. With this contention, upon a careful reading of the law, I am constrained to concur.

[1] Article 6 of the federal Constitution provides that:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made under authority of the United States, shall be the supreme law of the land."

It has long been the rule of decision in the United States, however, that in so far as the judicial department of the government is concerned a treaty occupies no position of superiority over an act of Congress. They are on a parity in so far as the provisions of the Constitution are concerned, and, like other expressions of the legislative will, when inconsistent or irreconcilable, the latest in point of time must control. Cherokee Tobacco Cases, 11 Wall. 616, 621, 20 L. Ed. 227; Head Money Cases, 112 U. S. 580, 598, 5 Sup. Ct. 247, 28 L. Ed. 798. In the event, then, of a conflict between an earlier treaty and a later act of Congress, the courts are bound to accord to the act of Congress compelling authority, and remit one who claims rights or privileges under the treaty, which are denied to him by the act of Congress, to the political department of the government. Tobacco Cases, supra. In other words, in such an exigency, if the country with whom the treaty has been ratified is dissatisfied with the action of the legislative department of our government, it may present its complaint to the executive head thereof, and take such other measures as it may deem necessary for the protection of its interests. The courts thereof, however, which are bound to act in conformity with the constitutional mandates of Congress, can afford no redress. Whitney v. Robertson, 124 U. S. 194, 8 Sup. Ct. 456, 31 L. Ed. 386.

[2] The Conscription or Selective Draft Law, being the act "to authorize the President to increase temporarily the military establishment of the United States," approved May 18, 1917, "in view of the existing emergency, which demands the raising of troops in addition to those now available," and authorizing the organizing and equipping of more than a million men under arms by selective draft, provided in section 2 thereof that:

"Such draft as herein provided shall be based upon liability to military service of all male citizens, or male persons not alien enemies, who have declared their intention to become citizens, between the ages of 21 and 30 years, both inclusive."

In section 4 certain federal, state, and other officers, ministers of religion, theological students, and members of the military and naval service of the United States are declared exempt; and it is also stated that nothing in the act contained shall be construed to require or compel the service of any member of a well-recognized religious sect, whose religious convictions are against war, etc. Provision is also made for partial exemption of other named classes. Section 5 provided that:

"All male persons between the ages of 21 and 30, both inclusive, shall be subject to registration in accordance with regulations to be prescribed by the

President; and upon proclamation by the President or other public notice given by him or by his direction stating the time and place of such registration it shall be the duty of all persons of the designated ages, except officers and enlisted men·in the regular army, the navy, and the National Guard and Naval Militia, while in the service of the United States, to present them-. selves for and submit to registration under the provisions of this act: * * * Provided, further, that persons shall be subject to registration as herein provided who shall have attained their twenty-first birthday and who shall not have attained their thirty-first birthday on or before the day set for the registration, *and all persons so registered shall be and remain subject to draft into the forces hereby authorized, unless exempt or excused therefrom as in this act provided.*" (Italics supplied.)

Section 14, the concluding section of the act, is to the effect that:

"All laws and parts of laws in conflict with the provisions of this act are hereby suspended during the period of this emergency."

No provision is made anywhere in the act for positive exemptions from service other than those referred· to; and no mention at all is made of any exemption because of treaties with any foreign nation. The language of the act requiring all male persons between the stated ages to. register, and providing that all persons so registered shall be and remain subject to draft "unless exempted or excused therefrom *as in this act provided,*" makes it impossible for me to conclude that it was intended by the act to exempt citizens of Spain or of other countries possessing similar treaty rights.

The particular claim is made by the petitioners that the language of section 2, to the effect that the draft "shall be based upon *liability to military service,*" is conclusive of an intent upon the part of Congress in the passage of this act to exclude from the operation of the act those who were not liable to military service because of some treaty provision. It is perhaps .difficult to appreciate just exactly what Congress had in mind in the use of the phrase "liability to military service"; there being no general law to which my attention has been called definitely establishing and fixing "liability to military service" under the laws of the United States. It has been the attitude of our State Department, from the time of Mr. Madison, when he was Secretary thereof, that resident aliens not naturalized are not liable to perform military service. Moore, International Law Digest, vol. 4, pages 51 to 65. Of course, the execution of a mere "declaration of intention" does not constitute naturalization. Moore's Digest, vol. 3, p. 336. The Congress, in the Draft Law of 1863 (Act March 3, 1863, c. 75, 12 Stat. 731), however enacted:

"That all able-bodied male citizens of the United States, and *persons of foreign birth who shall have declared their intention to become citizens* under and pursuant to the laws thereof, between the ages of 20 and 45 years, except as hereinafter excepted, are hereby declared to constitute the national forces and shall be liable to perform military duty in the United States when ordered out by the President for that purpose."

By Act April 22, 1898 (30 Stat. 361, c. 187, § 1 [Comp. St. 1916, § 1714]) it was provided:

"That all able-bodied male citizens of the United States, and *persons of foreign birth who shall have declared their intention to become citizens of the United States* under and in pursuance of the laws thereof, between the

ages of 18 and 45 years, are hereby declared to constitute the national forces, and, with such exceptions and under such conditions as may be prescribed by law, shall be liable to perform military duty in the service of the United States."

By the terms of the act passed January 21, 1903, which was subsequent to the negotiation of the treaty with Spain, though prior to its ratification or promulgation, it was provided that the militia should consist of "every able-bodied male citizen," and every *able-bodied male of foreign birth who has declared his intention to become a citizen,*" between the ages of 18 and 45. 32 Stat. 775, c. 196. It may have been that the phrase "liability to military service" was borrowed from the previous acts. It would seem as if the present Draft Act were in completest harmony with other military service statutes in that behalf. Be that as it may, however, the act does provide in express terms that the draft shall be based upon liability to military service of all male citizens and all male persons not alien enemies who have *declared* their intention to become citizens, and, as above recited, contains the further provision that of all persons registered none shall be exempt from service, unless exempt or excused "as in the act provided." The language seems indicative of such a "positive repugnancy" (Chew Heong v. United States, 112 U. S. 536, 549, 5 Sup. Ct. 255, 28 L. Ed. 770) to the terms of the treaty with Spain as to leave no room for the conclusion that they can be read together, and that Congress was intending that citizens of Spain, as well as of other countries, who had declared their intention of becoming citizens of the United States under the naturalization laws, should be subject to the demands of the emergency. The conclusion here announced is confirmed in a degree by the concluding section of the act, suspending all laws in conflict with it during the period of emergency.

It follows that the court, conceiving it to be its duty to follow the intent of Congress, must needs remand the petitioners to such relief as may be accorded to them by the political department of the government. The order to show cause is discharged, and the writs petitioned for are denied.