**UNITED STATES of America,
Plaintiff,**

v.

**Edwin Feliks GREDZENS, Defendant.
Crim. A. No. 7558.**

United States District Court
D. Minnesota, Third Division.

Nov. 30, 1954.

George E. MacKinnon, U. S. Atty., and Clifford Janes, Asst. U. S. Atty., St. Paul, Minn., for plaintiff.

William G. Dressel, Minneapolis, Minn., for defendant.

BELL, District Judge.

The above named defendant Edwin Feliks Gredzens was charged in an indictment returned January 23, 1953 with failing to report for induction into the Armed Forces of the United States on January 5, 1953. The charge was based on failure to perform a duty allegedly required of him under the Universal Military Training and Service Act of 1951, 50 U.S.C.A.Appendix, § 451 et seq., and the proclamation of the President of the United States issued thereunder. The case was tried before the Court, a jury being waived by both parties and was found guilty beyond a reasonable doubt.

The defendant admits that he has been a resident of Minnesota since 1950; that he registered with Local Board No. 96; that he was classified I-A by the Local Board and the Appeal Board of the Selective Service System; that he received an order from the Local Board to report for service in the Armed Forces and that he did not so report. In defense he asserts that as a Latvian citizen with rights under the Treaty with Latvia of 1928, 45 Stat., Part 2, 2641, he is exempt from such service, and, therefore, the Selective Service System acted beyond its jursdiction in classifying him I-A and in ordering him to report for induction.

The Government concedes that the terms of the 1928 Treaty, if *unamended,* would entitle the defendant to exemption from Military Service upon his proving to the Selective Service Board that the treaty was applicable to him. The Government contends that the Latvian Treaty of 1928 was amended by the Universal Military Training and Service Act, Act of June 24, 1948, Chapter 625, Title I, 62 Stat. 604 to 627, 50 U.S.C.A.App. §§ 451 to 473, and Amendments to the Universal Military Training and Service Act, Act of June 19, 1951, Chapter 144, Title I, 65 Stat. 75 to 89.

The jurisdiction of the Selective Service System to classify the defendant I-A and to order him to report for induction depends upon whether the laws established by the Treaty with Latvia were amended or abrogated by subsequently enacted statutes. This leads to consideration of the statutes with particular reference to those sections which pertain to the liability for, and exemption from, service of resident aliens. In discussing these statutes, primary references are to Title 50 U.S.C.A.Appendix. The Act of 1948 provided in Section 454 (a), 62 Stat. 605, § 4(a), as follows:

"(a) Except as otherwise provided in this title, every male citizen

of the United States, and every other male person residing in the United States * * * after having been required to register pursuant to section 3 of this title (Sec. 453 U.S.C.A., Title 50 App.), shall be liable for training and service in the armed forces of the United States. *Any citizen of a foreign country, who is not deferrable or exempt from training and service under the provisions of this title (other than this subsection), shall be relieved from liability for training and service under this title * * *."*

By the Amendments of 1951, 65 Stat. 75, 76, the italicized words above were amended to read in part as follows:

"Provided * * * That any male alien who is between the ages of 18 years and 6 months and 26 years, at the time fixed for registration, or who attains the age of 18 years and 6 months after having been required to register pursuant to section 3 of this title (Section 453 of this Appendix), or who is otherwise liable as provided in section 6(h) of this title (Section 456(h) of this Appendix) *who has remained in the United States in a status other than that of a permanent resident for a period exceeding one year* (other than an alien exempted from registration under this title and regulations prescribed thereunder) shall be liable for training and service in the Armed Forces of the United States, except that any such alien shall be relieved from liability for training and service under this title if * * * he has made application to be relieved * * * in accordance with rules and regulations prescribed by the President".

Section 456(a) by the Act of 1948, 62 Stat. 609, § 6(a), concluded with the words:

" * * * persons in other categories to be specified by the President, residing in the United States, and who have not declared their intention to become citizens of the United States, shall not be required to be registered under section 3 (Sec. 453 of 50 App.) and shall be relieved from training and service under section 4 (Sec. 454 of 50 App.)".

The 1951 Amendment of Section 456(e), 65 Stat. 83, added at the end thereof the significant words:

" * * * except that *aliens admitted for permanent residence in the United States shall not be so exempted.*"

Section 467(a) by the Act of 1948, 62 Stat. 625, provided as follows:

"Except as provided in this title, all laws and parts of law in conflict with the provisions of this title are hereby suspended to the extent of such conflict for the period in which this title shall be in force."

Section 467(a) by the Act of 1951, 65 Stat. 87 provided as follows:

"Except as provided in this title all laws or any parts of laws in conflict with the provisions of this title are hereby repealed to the extent of such conflict."

The Government contends that under these statutes there is no authority in law for the exemption of aliens admitted for permanent residence under any treaty executed prior to the enactment of the Acts of 1948 and 1951 referred to above, pointing out that while the treaty may have been self-executing, its provisions ceased to be the law to the extent that the language of the prior treaty was inconsistent with the provisions of the statutes subsequently enacted. The defendant contends that the Treaty grants the defendant an exemption beyond the power of this Country by Act of Congress to unilaterally amend, and that even if it be within the power of Congress so to do, Congress has not amended the Latvian Treaty of 1928, as it does not appear that Congress intended so to do in enacting the statutes cited above.

Obviously, if a treaty provides one thing and an act of Congress provides another, one or the other must yield.

The Cherokee Tobacco, 11 Wall. 616, 78 U.S. 616, 20 L.Ed. 227.

However, such direct conflict between an enactment by treaty and an enactment by act of Congress no longer poses any problem for the courts as it is well settled that the provisions of an act of Congress, passed in the exercise of its constitutional authority, must be upheld by the courts even in contravention of expressed stipulations in an earlier treaty. The Cherokee Tobacco, 11 Wall. 616, 78 U.S. 616, 20 L.Ed. 227; The Head-Money Cases (Edye v. Robertson), 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798; Fong Yue Ting v. U. S., 149 U.S. 698, 699, 13 S.Ct. 1016, 37 L.Ed. 905; J. Ribas y Hijo v. U. S., 194 U.S. 315, 24 S.Ct. 727, 48 L.Ed. 994; Guillermo Alvarez Y. Sanchez v. U. S., 216 U.S. 167, 30 S.Ct. 361, 54 L.Ed. 432. These principles have been clearly expressed by the Supreme Court in Chae Chan Ping v. U. S., 130 U.S. 581, 600, 9 S.Ct. 623, 627, 32 L.Ed. 1068, 1073, wherein the court said:

"It must be conceded that the act of 1888 is in contravention of express stipulations of the treaty of 1868, and of the supplemental treaty of 1880, but it is not on that account invalid, or to be restricted in its enforcement. The treaties were of no greater legal obligation than the act of congress. By the constitution, laws made in pursuance thereof, and treaties made under the authority of the United States, are both declared to be the supreme law of the land, and no paramount authority is given to one over the other. A treaty, it is true, is in its nature a contract between nations, and is often merely promissory in its character, requiring legislation to carry its stipulations into effect. Such legislation will be open to future repeal or amendment. If the treaty operates by its own force, and relates to a subject within the power of congress, it can be deemed in that particular only the equivalent of a legislative act, to be re-pealed or modified at the pleasure of congress. *In either case the last expression of the sovereign will must control.*

"The effect of legislation upon conflicting treaty stipulations was elaborately considered in the Head-Money Cases, and it was there adjudged 'that, so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as congress may pass for its enforcement, modification, or repeal.' 112 U.S. 580, 599, 5 S.Ct. 247 [28 L.Ed. 798, 804]. This doctrine was affirmed and followed in Whitney v. Robertson, 124 U.S. 190, 195, 8 S.Ct. 456 [31 L.Ed. 386, 388]."

The discussion and authorities above quite clearly provide the basis for decision in this case, in view of the fact that the defendant has so strongly urged the point that a prior treaty is amended only if Congress intended to do so, and that such Congressional intent must appear by specific statutory statement of amendment of treaty law; further consideration of this point is warranted. In Section 456 of Title 50 U.S.C.A.Appendix quoted above as amended by the Amendment of 1951, it appears that Congress expressly provided "that aliens admitted for permanent residence in the United States shall not be so exempted." It seems clear that Congress in using this language intended just one thing,—that aliens admitted for permanent residence should not be exempted; within the words of this enactment are to be found a clear expression of congressional intent that all resident aliens are subject to service. The decision of the Supreme Court in Guillermo Alvarez Y. Sanchez v. U. S., supra, is fully applicable here as shown by the language in the court's opinion [216 U.S. 167, 30 S.Ct. 363]:

"It is true that Congress did not, we assume, intend by the Foraker act to modify the treaty, but, if that

act were deemed inconsistent with the treaty, the act would prevail; for an act of Congress, passed after a treaty takes effect, must be respected and enforced, despite any previous or existing treaty provision on the same subject. J. Ribas y Hijo v. United States, 194 U.S. 315, 324, 24 S.Ct. 727, 48 L.Ed. 994, 996, and authorities cited."

The defendant has called our attention to the case of Cook v. U. S., 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641, which held to the effect: "That a treaty will not be deemed to be abrogated by a later act of Congress unless the purpose to so abrogate is clearly expressed." The Military Training and Service Acts cited above clearly express the Congressional purpose to abrogate any law, treaty or others, inconsistent therewith; such clear expression is not to be voided by judicial inquiry into the mental processes of those using the words. In the language of the Court in Cook v. U. S., supra, it appears that as to the Treaty with Latvia "the purpose to so abrogate is clearly expressed." Further expression of Congressional intent to suspend and repeal inconsistent law appears in Title 50 App., U.S.C. Section 457, 50 U.S.C.A.Appendix, § 457.

At the trial the defendant offered in evidence, as plaintiff's Exhibit "A", a copy of Local Board Memorandum No. 29 issued by the National Director of Selective Service on February 5, 1951. This memorandum recommends procedures to be followed by local Selective Service Boards in considering claims for exemption from service based on the Treaty with Latvia and other treaties. The government conceded that plaintiff's Exhibit "A" was a true copy of such memorandum but objected to its being admitted in evidence on the grounds that it was irrelevant and immaterial for the reason that the statutes prohibit the exemptions for which this memorandum provides administrative procedures. The Court overruled the objection at that time, subject to the Court's further consideration.

■ Upon such further consideration, the Government's objection has been sustained. As the defendant in this case was an alien admitted for permanent residence in the United States, he was by Act of Congress declared ineligible for exemption as an alien. Therefore, the procedures set forth in this memorandum are inapplicable to him, and as to him they are void.

■ It is well established that regulations of a department cannot have the effect of amending the law; they may aid in carrying the law, as it exists, into execution, but they cannot change its positive provisions. U. S. v. Two Hundred Barrels of Whiskey, 95 U.S. 571, 24 L.Ed. 491. Upon the same principles, the Selective Service Regulations pertaining to aliens with treaty rights cited by the defendant are inapplicable to him, as the treaty rights which the defendant claimed ceased to exist as to him not later than the 1951 amendments to the Universal Military Training and Service Act.

The principles of this decision holding the Treaty with Latvia abrogated so far as Gredzens, a resident alien, is concerned, find support in Ex parte Blazekovic, D.C., 248 F. 327, wherein the 1917 draft act was held to supersede the terms of a prior treaty with Austria-Hungary granting exemption to certain aliens from Military Service. The same conclusion with respect to the abrogation of treaties by the 1917 draft act was reached in Summertime v. Local Board, etc., D.C., 248 F. 832, and in Ex parte Larrucea, D.C., 249 F. 981. The 1940 Selective Training and Service Act was held in Totus v. U. S., D.C., 39 F.Supp. 7, to supersede a treaty between the United States and an Indian Tribe to the extent that the treaty and the service were in conflict. To the same effect see U. S. v. Claus, D.C., 63 F.Supp. 433 and Albany v. U. S., 6 Cir., 152 F.2d 266. In discussing the 1940 Selective Service

Act, the Court of Appeals for the Second Circuit, in Petition of Moser, 2 Cir., 182 F.2d 734, 738, said: "It seems abundantly clear that this statute was designed to treat alike aliens who were treaty-exempt from military service and those who were not. While in our opinion there was no violation of the treaty with Switzerland in doing so, even if there had been, the statute would control." While the Moser case was reversed on other grounds by the Supreme Court, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729, that court in the course of its opinion said that it did not doubt that a treaty may be modified by a subsequent act of Congress.

Of particular interest to the subject now before this Court is the case of U. S. v. Rumsa, 7 Cir., 212 F.2d 927, 932, certiorari denied, 75 S.Ct. 36. In that case Rumsa claimed to be a Lithuanian subject and exempt from liability from service under the terms of a treaty with Lithuania, such treaty also antedating the Amendments to the Universal Military Training and Service Act of June 1951. The Court in that case sustained the defendant's conviction for failure to submit to induction, stating:

"If the United States had made a prior treaty with Lithuania or an agreement with other nations providing that Lithuanian subjects or other aliens should not be inducted into our armed forces, such a treaty or agreement would be in conflict with the provisions of the Universal Military Training and Service Act as amended, [by act of 1951] and this later Act of Congress would prevail. Where such a treaty or agreement is in conflict with a later conscription statute enacted by Congress the treaty or agreement is thereby suspended insofar as it conflicts, and, therefore, cannot be invoked as a defense to a violation of the conscription law. Ex parte Blazekovic, D.C., 248 F. 327, 337; Ex parte Larrucea, D.C., 249 F. 981, 983."

The Government contends, and perhaps correctly, that as the defendant had not reported for induction, he had not exhausted his administrative remedies and therefore was not entitled to question the jurisdiction of the Selective Service System in classifying the defendant for service, Falbo v. U. S., 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305; Estep v. U. S., 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, and in ordering him to report.

In view of the rather broad assertions of the defendant that the Latvian Treaty limited the jurisdiction of the Selective Service System, the Court has reviewed the law pertaining to the Selective Service System's jurisdiction over the defendant.

As the statutes clearly render this defendant subject to all the lawful procedures and orders of the Selective Service System, it becomes unnecessary to consider whether the terms of the Treaty would have required the defendant to become a registrant of the Selective Service System and otherwise subject himself to its administrative procedures.

The defendant has asserted that as Selective Service System memoranda and regulations recognize that Latvians can be exempt from service, the defendant should not be convicted of a crime in this case. While the law, and not void regulations govern, it seems well to point out that in this case the defendant was notified of his classification of I–A by the Selective Service System Local Board, and later of his classification of I–A by the Selective Service System Appeal Board, and received the written order to report for induction issued by the Selective Service System Local Board. It is clear that he had been informed by the Selective Service System, and knew, that his obligation was to report as ordered, and that failure to so report was a criminal offense.

The Court has found the defendant guilty as charged.