Petition for Naturalization of Andreas Carl CHRAMBACH.

No. 47566.

United States District Court,
D. Maryland.

June 28, 1972.

David Carliner, Washington, D. C., and Elsbeth L. Bothe, Baltimore, Md., for petitioner.

FRANK A. KAUFMAN, District Judge.

Andreas Carl Chrambach, a citizen of Germany, has petitioned this Court for naturalization, pursuant to 8 U.S.C. § 1421.[1] The United States Naturalization Examiner has recommended to this Court that the petition be denied on the grounds that Chrambach is ineligible for citizenship under the provisions of section 315(a) of the Immigration and Nationality Act, 8 U.S.C. § 1426(a) which provides, in pertinent part:

(a) Notwithstanding the provisions of section 405(b) of this Act, any alien who applies or has applied for exemption or discharge from training or service in the Armed Forces or in the National Security Training Corps of the United States on the ground that he is an alien, and is or was relieved or discharged from such training or service on such ground, shall be permanently ineligible to become a citizen of the United States.

In an affidavit submitted in support of his petition for naturalization Chrambach has stated that he is the son of parents who were devout converts to Roman Catholicism from the Jewish faith. At the age of 10 his parents enrolled him in a Jesuit school in Berlin. Both his upbringing as a child by his family and his early formal education instilled in him, in his own words, "a personal faith which would give priority to the service of God over all other values and goals in life."

Because of their Jewish ancestry, petitioner and his family were classified as Jews under the Nazi government's race legislation. In 1937, Chrambach's father

1. § 1421. *Jurisdiction to naturalize*
　(a) Exclusive jurisdiction to naturalize persons as citizens of the United States is conferred upon the following specified courts: District courts of the United States . . . . The jurisdiction of all the courts herein specified to naturalize persons shall extend only to such persons resident within the respective jurisdiction of such courts, except as otherwise specifically provided in this subchapter.
＊　　＊　　＊　　＊　　＊

left home on a "business trip" and never returned. In 1939, petitioner, his brother, and his mother fled to Hungary to escape the Nazi tyranny. As in so many cases, their flight only delayed the terrible tragedy that befell those who were the object of Hitler's "final solution." Petitioner was imprisoned in Hungary and later sent to Auschwitz. He was liberated in 1945 and returned to Budapest to search for his family. While in that city he contacted the Jesuit Order with the intention of becoming a novice. Then, in late 1945, he learned that his mother was alive and in Germany and he returned there. His brother had not survived. From 1946 until 1948, petitioner attended law school at the University of Berlin. In 1949, he and his mother emigrated to the United States, being lawfully admitted into this country for permanent residence on April 20, 1949.

Petitioner's Selective Service file, which, under section 315(b) of the Immigration and Nationality Act, 8 U.S.C. § 1426(b), is "conclusive as to whether . . . [he] was relieved or discharged from such liability for training and service because he was an alien," discloses the following information:

After petitioner settled in Stockton, California, he registered on July 11, 1949 with the Selective Service as he was required by law to do, and shortly thereafter he was classified I–A (available for military service) by his local draft board. Petitioner's Selective Service records further show that on May 21, 1950 he wrote a letter to his local board stating: "I herewith apply to be relieved from the liability of military service, because I am a citizen of Germany, under Section 4(a) of the Selective Service Act 1948, on grounds of above application I herewith appeal my previous classifica-

tion I–A . . . and ask you to be classified an alien not liable to military training or service." On July 24, 1950, petitioner executed, under oath, an "Application by Alien for Relief from Training and Service in the Armed Forces," SSS Form No. 130, which stated in part:

I hereby apply for relief from liability for training and service in the armed forces of the United States. I have read the NOTICE given below, and I understand that I will forever lose my right to become a citizen of the United States, and I may also be prohibited from entry into the United States or its territories or possessions as a result of filing this application.

The said "NOTICE," clearly printed at the bottom of the form, reads, in relevant part, as follows:

### NOTICE

Section 4(a) of the Selective Service Act of 1948, provides in part that "Any citizen of a foreign country, who is not deferrable or exempt from training and service under the provisions of this title (other than this subsection), shall be relieved from liability for training and service under this title if, prior to his induction into the armed forces, he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President; but any person who makes such application *shall thereafter be debarred from becoming a citizen of the United States.*" (Emphasis supplied.) [2]

\* \* \* \* \* \*

After petitioner executed that application for exemption from military service, his local draft board, on August 9, 1950, changed his Selective Service classification from I–A to IV–C (Aliens).[3]

---

2. 62 Stat. 605, 50 U.S.C.App. § 454(a) (1950).

3. The Selective Service regulations promulgated by Executive Order on August 21, 1948 under the Selective Service Act of 1948 provided, in part:

§ 622.18 *Class IV–C: Aliens.* (a) In Class IV–C shall be placed any registrant who is an alien and who, prior to his induction, has made application to be relieved from liability for training and service in the armed forces of the

In 1951, by passage of section 4(a) of the Universal Military Training and Service Act,[4] effective June 19 of that year, Congress amended the Selective Service Act of 1948 with regard to the exemption that had previously been available to all resident aliens, such as the petitioner, under the 1948 Act and regulations. However, for reasons that are not disclosed by the record in this case, at least with regard to the period between June 19, 1951 and May 20, 1953, petitioner's status with his draft board remained unchanged after the 1951 amendments to the Selective Service law and he retained his IV–C classification even though the exemption for aliens admitted for permanent residence no longer existed under the Selective Service law in effect after June 19, 1951.

The Selective Service regulations promulgated under the 1951 Act did continue to provide an exemption for a class of aliens, known as "treaty aliens," [5] who were "exempt from military service under the terms of a treaty or international agreement between the United States and the country of which [the alien] is a national." [6] And it was pursuant to those regulations that on May 20, 1953, almost two years after the 1951 Act took effect, petitioner executed an "Application by Alien for Exemption from Military Service in the Armed Forces of the United States," Selective Service Form C–294. That application stated in part:

I hereby request exemption from military service in the Armed Forces of the United States; that as an alien I claim such exemption under and pursuant to the terms of a treaty existing by and between the country of which I am a citizen and the United States of America;

That I request exemption from such military service with full knowledge of the provisions of Section 315 of the Immigration and Nationality Act that any alien who applies or has applied for exemption from training or service in the Armed Forces of the United

United States by filing with the local board an Application by Alien for Relief from Training and Service in the Armed Forces (SSS Form No. 130), executed in duplicate. * * * [32 C.F.R. § 622.18 (Supp.1948); 13 Fed.Reg. 4856 (1948).]

4. 65 Stat. 76, 50 U.S.C.App. § 454 (1951). That section provided, *inter alia:*
   (a) Except as otherwise provided in this title, every male citizen of the United States and every male alien admitted for permanent residence, who is between the ages of 18 years and 6 months and 26 years, at the time fixed for his registration, or who attains the age of 18 years and 6 months after having been required to register pursuant to section 3 of this title, or who is otherwise liable as provided in section 6(h) of this title, shall be liable for training and service in the Armed Forces of the United States: *Provided,* That each registrant shall be immediately liable for classification and examination, and shall, as soon as practicable following his registration, be *so classified* and examined, both physically and mentally, in order to determine his availability for induction for training and service in the Armed Forces: *Provided further,*

That any male alien who is between the ages of 18 years and 6 months and 26 years, at the time fixed for registration, or who attains the age of 18 years and 6 months after having been required to register pursuant to section 3 of this title. or who is otherwise liable as provided in section 6(h) of this title, who has remained in the United States in a status other than that of a permanent resident for a period exceeding one year (other than an alien exempted from registration under this title and regulations prescribed thereunder) shall be liable for training and service in the Armed Forces of the United States, except that any such alien shall be relieved from liability for training and service under this title if, prior to his induction into the Armed Forces he has made application to be relieved from such liability in the manner prescribed by and in accordance with rules and regulations prescribed by the President; but any alien who makes such application shall thereafter be debarred from becoming a citizen of the United States. * * *

5. See 42 Op. Att'y Gen. No. 28 (1968).

6. 32 C.F.R. § 1622.42(c) (Supp.1951); 16 Fed.Reg. 9852 (1951).

States on the ground that he is an alien, and is or was relieved from training or service on such ground, shall be permanently ineligible to become a citizen of the United States; further, that the records of the Selective Service System shall be conclusive as to whether an alien was relieved from such liability for training or service because he was an alien.[7]

After petitioner signed that statement his local board continued to classify him as IV–C until he was finally classified V–A (registrant over the age of liability for military service) on November 18, 1954.

Petitioner seeks to avoid the consequences—permanent ineligibility for citizenship—imposed by section 315 of the Immigration and Nationality Act on those who apply for and are granted relief from military service on the ground of alien status, by claiming first that his applications were based on his misunderstanding of the law. According to petitioner, when he received notification from his draft board that he had been classified I–A, he went to the law library at the county courthouse in Stockton, California and engaged in legal research to determine whether or not he was eligible for exemption from military service as a conscientious objector.[8] On the basis of that research and conversations he had with several Catholic priests, petitioner reached the following conclusions: (1) that in order to be exempt as a conscientious objector one had to be a member of a traditionally pacifist church and that accordingly because he was a Roman Catholic he was not eligible for Selective Service conscientious objector classification; and (2) that those aliens who were granted exemption from Selective Service as conscientious objectors would not subsequently be able to become American citizens by naturalization.

Petitioner claims that those conclusions presented him with only two alternatives:

Either I registered as an objector with the consequence of being (a) not recognized as such and imprisoned for refusal to bear arms; and (b) not naturalized; or I did not register as an objector and had a chance to be naturalized if not called into military service. If I were called into military service I could refuse on grounds of alienage and would thus be also excluded from citizenship, but with-

---

7. In 42 Op. Att'y Gen. No. 28 at 2–3 (1968), Attorney General Ramsey Clark wrote:

The Selective Service Act of 1948, section 4(a) (June 24, 1948, c. 625, 62 Stat. 604, 605–606) rendered liable for service resident aliens who were not otherwise exempt. Any such alien could obtain exemption from service upon application, but applying for exemption barred the alien from eligibility for United States citizenship.

Treaty aliens received somewhat different treatment. A resident treaty alien who had not made a declaration of intention to become an American citizen could be exempted from service without personally filing an application for relief, and could thus receive an exemption without being barred from citizenship under section 4(a). It appears to have been assumed at that time that the source of this treatment was section 6(a) of the act, which authorized the President to exempt from registration and military service, or from service alone, categories specified by him of resident aliens who had not declared their intention to become citizens of the United States.

In 1951 Congress amended the Selective Service Act so that section 4(a) no longer provided a procedure for the exemption of resident aliens. Section 6(a) continued to provide that the President could specify categories of noncitizens to be relieved from registration and service, but an amendment added the qualification "that aliens admitted for permanent residence in the United States shall not be so exempted." (65 Stat. 75, 83) [Footnote omitted.]

8. At that time, petitioner states that he did not have sufficient funds to retain legal counsel. Apparently, he either did not know where or how to obtain counsel, totally or partially free of charge, or such counsel was unavailable.

out going to prison as well. I choose this latter path, in particular since I dreaded nothing more than loss of personal freedom in imprisonment, having just 3 years earlier been miraculously emerged alive from imprisonment at Auschwitz, and having emigrated to America to start a new life away from the past horrors and not in order to go to jail for my beliefs. * * * I would have run to the end of the world rather than to be imprisoned again, and chose therefore the only emotionally possible path left to me.

■ Assuming as respondent agrees this Court should do, the sincerity and strength of petitioner's religious beliefs and in no way denigrating the dilemma which confronted petitioner when he first applied for the alien exemption in 1950, there is nothing in the record of this case to suggest that petitioner did not have "an opportunity to make an intelligent election between the diametrically opposed courses required as a strict matter of law." Moser v. United States, 341 U.S. 41, 47, 71 S.Ct. 553, 556, 95 L.Ed. 729 (1951). Petitioner does not claim that he was under any misapprehension as to the effect of his application for alien exemption status. In fact, petitioner states that he understood that if he successfully so applied, he would be barred from citizenship. See Moser v. United States, supra; Mannerfrid v. United States, 200 F.2d 730, 732–733 (2d Cir. 1952) (L. Hand, J.). Nor were his conclusions concerning his ineligibility for conscientious objector status the product of representations made to him by his draft board or any other person in an official capacity. See Moser v. United States, supra; Machado v. McGrath, 89 U.S.App.D.C. 70, 193 F.2d 706, 708–709 (1951), cert. denied, 342 U.S. 948, 72 S.Ct. 557, 96 L.Ed. 705 (1952). See generally 1 Gordon and Rosenfield, Immigration Law and Procedure § 2.49d (1971). Although petitioner may have been eligible for a consci-

entious objector exemption in 1950, he made the decision himself that he was not so eligible. He did not seek to have the question determined by Selective Service. Consequently, it was not incumbent upon his local board to take the initiative and to inquire whether petitioner was a conscientious objector before allowing him to file an application for alien exemption. See Prieto v. United States, 289 F.2d 12, 14 (5th Cir. 1961).

■ Accordingly, this Court holds that petitioner's decision to apply for the alien exemption is not nullified by mistake of law.

Petitioner also contends that he was not relieved from liability for service in the Armed Forces of the United States and therefore is not, pursuant to section 315 of the Immigration and Nationality Act of 1952, barred from becoming a citizen of the United States.

In Astrup v. Immigration and Naturalization Service, 402 U.S. 509, 91 S.Ct. 1583, 29 L.Ed.2d 68 (1971), Mr. Justice Black reviewed the statutory scheme established by section 4(a) of the Selective Service Act of 1948, under which the petitioner herein was first granted exemption from military service, and by section 315 of the Immigration and Nationality Act of 1952. In so doing, he described those statutes as providing a "bargain" between the alien and the United States in which the alien "agree[s] to give up his right to become an American citizen, and in exchange, the United States . . . agree[s] to give up the right to induct [the alien] into the United States armed forces." 402 U.S. at 510, 91 S.Ct. at 1584. Under Mr. Justice Black's analysis, section 315 requires that two conditions must be fully satisfied before the alien loses his eligibility for citizenship. First, he must apply for exemption from military service; and secondly, he must be relieved or discharged from such service on the ground that he is an alien.[9]

9. *Astrup* makes it clear that it is the two requirements of section 315 of the Immigration and Nationality Act—and not

section 4(a) of the Selective Service Act of 1948, which contains the single requirement that the alien apply for exemp-

In *Astrup,* the alien seeking citizenship had applied for and received an alien exemption under section 4(a) of the Selective Service Act of 1948, and, in so doing, lost his right to become a citizen. After Congress passed the Universal Military Training and Service Act in 1951 eliminating, as of June 19, 1951, the alien exemption as such and making all resident aliens liable for military service and thus, in Mr. Justice Black's words, "reneging on its part of the bargain . . .," Astrup was ordered to report for induction. However, he was found by the military to be physically unfit for service. In holding that the fact that Astrup was physically disqualified did not mean that he was "relieved or discharged from . . . training or service" within the terms of section 315 and that Astrup was not barred from citizenship, Mr. Justice Black wrote, for a unanimous Court:

> We think that Congress used the words "is or was relieved" to provide that an alien who requests exemption from the military service be held to his agreement to relinquish all claims to naturalized citizenship *only* when the Government abides by its part of the agreement and completely exempts him from service in our armed forces. [Emphasis in original; footnote omitted; 402 U.S. at 513–514, 91 S.Ct. at 1585.]

Chrambach's petition for naturalization and his accompanying Selective Service file present factual circumstances which differ in two respects from those before the Supreme Court in *Astrup.* Chrambach, unlike Astrup was never, after June 19, 1951, or at any other time, ordered to report for induction after his statutory alien exemption was eliminated by Congress in that year. Thus, in one sense, Chrambach may perhaps be said, as the Naturalization Examiner has contended in these proceedings, to have been "effectively relieved" from military service because of his alien status. *See* In Re Thanner, 253 F.Supp. 283, 286–287 (D.Colo.1966); United States ex rel. Rosio v. Shaughnessy, 134 F.Supp. 217, 218 (S.D.N.Y.1954); Schenkel v. Landon, 133 F.Supp. 305, 310–311 (D.Mass.1954) (Wyzanski, J.).[9a] However, section 4(a) of the Universal Military Training and Service Act of 1951 provides that "every male alien admitted for permanent residence, who is between the ages of 18 years and 6 months and 26 years . . . *shall be liable* for training and service in the Armed Forces of the United States . . . ." (emphasis added).[10] Thus, under the 1951 Selective Service law, resident aliens like petitioner who had enjoyed a statutory exemption before the passage of the 1951 Act were no longer relieved from the obligation to serve in the military should they have been called by the Government of the United States. The fact that, for whatever reason, Selective Service failed to call Chrambach, after June 19, 1951 and before May 20, 1953, in no way relieved Chrambach, if he had been called during that period, from his *liability* for service after the statutory alien exemption was eliminated effective June 19, 1951. And it is *total* relief from liability for service, or complete exemption, which *Astrup* appears to require before section 315 of the Immigration and Nationality Act can be raised to bar citizenship. 402 U.S. at 513 n. 3, 91 S.Ct. 1583. *Cf.* In Re Gourary's Petition, 148 F.Supp. 140 (S.D.N.Y.1957) (Weinfeld, J.).

After his statutory alien exemption under the 1948 Selective Service Act was no longer available to him in 1951, Chrambach filed on May 20, 1953 a second application for exemption from military service, basing his claim to such an exemption as a "treaty alien" on a

tion before losing his right to citizenship— which govern petitioner's rights in a case such as this one. 402 U.S. 509, 91 S.Ct. 1583, 29 L.Ed.2d 68. *See* Ceballos v. Shaughnessy, 352 U.S. 599, 605–606, 77 S.Ct. 545, 1 L.Ed.2d 583 (1957).

9a. Those three cases were all decided prior to *Astrup.*

10. See n. 4 *supra.*

treaty between the United States and Germany. The treaty referred to in the Selective Service application form signed by Chrambach appears to be, as far as this Court and counsel have been able to determine, the Treaty of Friendship, Commerce and Consular Rights, signed at Washington, D. C. on December 8, 1923. Article VI of that treaty is the only article arguably relevant to the resolution of the issue in this proceeding.[11]

Even assuming *arguendo* that Chrambach is within the class of aliens covered and exempted by Article VI of the treaty,[11a] the grant of an exemption, if any, from military service under its terms does not make Chrambach ineligible at this time for citizenship since by a diplomatic note of June 2, 1953, the Department of State of the United States notified the Charge d'Affaires of the Federal Republic of Germany that the United States would no longer consider Article VI of the treaty in force and effect after June 2, 1954.[12] Thus, Chrambach's treaty exemption was eliminated by executive action effective

11. Article VI provides:

In the event of war between either High Contracting Party and a third State, such Party may draft for compulsory military service nationals of the other having a permanent residence within its territories and who have formally, according to its laws, declared an intention to adopt its nationality by naturalization, unless such individuals depart from the territories of said belligerent Party within sixty days after a declaration of war.

44 Stat. 2132, 2136 (1923).

11a. While the "Korean War" took place during the period material herein, there was no declared war during that period. Further, Chrambach, although a permanent resident, had not before November 18, 1954 declared an intention to become a citizen. In addition, the treaty provision itself would not seem to establish any exemption from conscription for anyone. If Chrambach was a person covered by that treaty provision, at best he had an option to "depart" from the United States, not to remain and be entitled to exemption from the draft.

12.

The Secretary of State to the
Charge d'Affaires of the Federal
Republic of Germany

Department of State
Washington
June 2 1953

Sir:

I refer to various discussions which have taken place concerning the liability of German nationals to compulsory service in the armed forces of the United States, and to the problem presented to this Government in carrying out the provisions of Article VI of the Treaty of Friendship, Commerce and Consular Rights signed at Washington on December 8, 1923, in the light of the Universal Military Training and Service Act of 1951. The Act provides that aliens admitted to the United States for permanent residence shall be subject to induction on the same terms as United States citizens.

In view of this situation, I wish to inform you of the desire of this Government to modify the said Treaty as provided in Article XXXI thereof, by omitting the said Article VI, and I herewith request you to notify your Government that, beginning one year from the date of this note, the Government of the United States will consider the said Article VI to be no longer an operative part of the said Treaty of 1923.

Accept, Sir, the renewed assurances of my high consideration.

For the Secretary of State:
G. W. Lewis

Dr. Heinz L. Krekeler,
    Charge d'Affaires of the
        Federal Republic of Germany.

5 U.S.T. 828, 829, TIAS No. 2972. Article XXXI of the treaty authorized such unilateral modification upon one year's notice.

June 2, 1954, and from that date until he was classified V–A on November 18, 1954, he was liable for service in the Armed Forces of the United States and, under Astrup v. Immigration and Naturalization Service, *supra,* was not legally relieved from such service.

In addition, there is authority to the effect that the treaty exemptions for resident aliens did not survive Congress' passage of the 1951 Act which eliminated the general alien exemption existing under the 1948 Selective Service Act. *See* Petition for Naturalization of Rego, 289 F.2d 174, 176–177 (3d Cir. 1961); United States v. Rumsa, 212 F.2d 927, 931–932 (7th Cir.), cert. denied, 348 U.S. 838, 75 S.Ct. 36, 99 L.Ed. 661 (1954); United States ex rel. Rosio v. Shaughnessy, *supra;* United States v. Gredzens, 125 F.Supp. 867 (D.Minn.1954). Section 6 (a) of the 1951 Act did provide that the President of the United States could designate certain categories of persons who were not United States citizens and who would be relieved from registration and service. However, that same section also provided that "aliens admitted for permanent residence . . . shall not be so exempted." [13] A literal reading and application of that provision of section 6(a) would seem to cause that section to take precedence over and to abrogate any treaty provision in existence before the effective date of the 1951 Act, exempting a foreign state's citizens who are admitted into the United States for permanent residence from service in the Armed Forces of the United States. If so read, the effect of section 6(a) of the 1951 Act would have been to remove Article VI of the Treaty of Friendship, Commerce and Consular Rights between the United States and Germany as an operative provision of that treaty and to render without legal basis the exemption granted to the petitioner on May 20, 1953. However, in Schenkel v. Landon, *supra,* Judge Wyzanski, while admitting that his "reading of the statute . . . would not appeal to a grammarian," concluded that Congress had not intended the 1951 Act to deprive the President of his power to promulgate regulations exempting resident aliens and that "the word 'such' which appears before the word alien in the clause 'any such alien shall be relieved from liability for training and service under this title if, prior to his induction * * *'" was intended as a reference back to every alien covered anywhere in the whole of § 4(a)." 133 F.Supp. *supra* at 308–309. To the same effect, *see* Ungo v. Beechie, 311 F.2d 905, 906–907 (9th Cir. 1963).[14] In this case, it is not necessary for this Court to express any opinion on that issue in view of the June 2, 1953 diplomatic note eliminating Article VI of the treaty as an operative provision, effective June 2, 1954, more than five months before Chrambach became over-age for induction.[15]

The Immigration and Naturalization Service argues that even if petitioner

13. That statute (65 Stat. 76, 83) provides, in relevant part:
[F]oreign diplomatic representatives, technical attaches of foreign embassies and legations, consuls general, consuls, vice consuls, and other consular agents of foreign countries who are not citizens of the United States, and members of their families, and persons in other categories to be specified by the President who are not citizens of the United States, shall not be required to be registered under section 3 and shall be relieved from liability for training and service under section 4, except that aliens admitted for permanent residence in the United States shall not be so exempted.

14. In 42 Op. Att'y Gen. No. 28 at 6–7 (1968) (see n. 7 *supra*), the Attorney General, noting the State Department's agreement with the position stated in Ungo v. Beechie, *supra,* and Schenkel v. Landon, *supra,* as against the Selective Service Director's opposing view as set forth in the *Rego, Rumsa, Shaughnessy* and *Gredzens* cases, stated his agreement with the State Department. For an indication that the State Department changed its own earlier view, see n. 12 *supra.*

15. Even if the treaty provision applied by its terms to Chrambach and even if the views expressed by Judge Wyzanski and the 1968 views of the Department of State and the Department of Justice are cor-

was not legally entitled to exempt Selective Service status after the modification of the treaty in 1953 effective June 2, 1954, the *de facto* granting to him of relief from military service acts as a bar to naturalization under section 315 of the Immigration and Nationality Act. *See* In Re Thanner, *supra*; Schenkel v. Landon, *supra,* 133 F.Supp. at 310–311; 42 Op. Att'y Gen. No. 28 at 4 n. 7 (1968). However, as discussed *supra, Astrup* requires complete *legal* exemption, not simply *de facto* exemption, before section 315 is applicable.

Accordingly, this Court holds that section 315 does not constitute a bar to the granting of Chrambach's quest for naturalization and hereby grants his petition for naturalization. The Immigration and Naturalization Service shall promptly present to this Court an appropriate Order to that effect.

It is so ordered.

rect, nevertheless, Chrambach was liable for military service for a period of five months, from June 2, 1954 until November 18, 1954 when he became over the age for induction.